307 F.3d 1364
 FLORIDA POWER & LIGHT COMPANY, Consolidated Edison Company of New York, Inc., Empresa Nacional Del Uranio, S.A., IES Utilities, Inc., Niagara Mohawk Power Corporation, Pennsylvania Power and Light Company, Wisconsin Electric Power Company, Duke Energy Corporation, and Virginia Electric and Power Company, Plaintiffs-Cross-Appellants,
v.
UNITED STATES, Defendant-Appellant.
 No. 02-5012.
 No. 02-5023.
 United States Court of Appeals, Federal Circuit.
 October 4, 2002.
 
 Alex D. Tomaszcuk, Shaw Pittman LLP, of McLean; VA, argued for plaintiffs-cross appellants. Of counsel on the brief were John H. O'Neill, Jr., Michael G. Lepre, and Daniel S. Herzfeld, Shaw Pittman LLP, of Washington, DC.
 James G. Bruen, Jr., Special Litigation Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; J. Christopher Kohn, Director; and Matthew J. Troy, Attorney. Of counsel on the brief was Marc E. Kasischke, Attorney, Office of General Counsel, Department of Energy, of Washington, DC.
 Before MICHEL, CLEVENGER, and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 The United States government has long performed uranium enrichment for domestic and foreign utility companies. Uranium enrichment consists of converting natural uranium into enriched uranium suitable for use in nuclear power plants. Each of the plaintiff utilities entered into an enrichment contract with the United States before September 1, 1992. Until July 1, 1993, the contracts were administered and performed through the Department of Energy ("DOE").
 
 
 2
 Under the contracts, the utilities agreed to purchase a fixed percentage of their enriched uranium needs from the United States. The contracts specified how the enriched uranium would be provided and how the utilities would be charged. The price for the enrichment services was to be "determined in accordance with the established DOE pricing policy for such services." The contracts defined "established DOE pricing policy" as "any policy established by DOE that is applicable to prices or charges in effect at the time of performance of any services under this contract."
 
 
 3
 The price DOE could charge for enrichment services was constrained by section 161(v) of the Atomic Energy Act, which specified that "any prices established under this subsection shall be on a basis of recovery of the Government's costs over a reasonable period of time." 42 U.S.C. § 2201(v) (1988). DOE pricing policy followed that statutory formula. See 10 C.F.R. § 762.5 (1994) (DOE's charges for enrichment services established "on a basis that recovers appropriate Government costs over a reasonable period of time"). DOE's price was expressed as a dollar amount for each unit of enrichment services, referred to as a "Separative Work Unit" ("SWU"). For Fiscal Year 1993, the price charged for enrichment services was $125 per SWU, which was near the ceiling price under the enrichment contracts.[1]
 
 
 4
 The Energy Policy Act of 1992 amended the Atomic Energy Act and made significant changes in the government's uranium enrichment services program. The new statute established the United States Enrichment Corporation ("USEC") to take over the enrichment services from DOE. All existing uranium enrichment contracts, including those with the plaintiff utility companies, were transferred to USEC as of July 1, 1993. 42 U.S.C. §§ 2297b-14(e), 2297c(b)(1) (1994).
 
 
 5
 The Energy Policy Act also established the Uranium Enrichment Decontamination and Decommissioning Fund, which was to pay "[t]he costs of all decontamination and decommissioning activities of [DOE]," 42 U.S.C. § 2297g-2(b), and "[t]he annual cost of remedial action," 42 U.S.C. § 2297g-2(c). The Decontamination and Decommissioning Fund is supported in part by a special assessment of up to $150 million collected annually from domestic utilities that purchased enrichment services from DOE between 1945 and October 23, 1992. The first annual assessment was for Fiscal Year 1993.
 
 
 6
 During the transition period between October 24, 1992, when the Energy Policy Act was enacted, and July 1, 1993, when USEC began administering the enrichment services contracts, DOE continued performing enrichment services under the contracts. In 1996, the utilities filed suit, asserting that during the transition period DOE had improperly included decontamination and decommissioning costs in its contract prices. The utilities contended that recovering those costs was improper because DOE had separately recovered those costs through the Fiscal Year 1993 special assessment. The Court of Federal Claims dismissed the suit on res judicata grounds, Fla. Power & Light Co. v. United States, 41 Fed. Cl. 477 (1998), but we reversed and remanded, Fla. Power & Light Co. v. United States, 198 F.3d 1358 (Fed.Cir.1999).
 
 
 7
 On remand, the utilities abandoned their claim that DOE had improperly collected decontamination and decommissioning costs during the transition period, but they asserted that DOE's price for enrichment services improperly included approximately $1.5 billion in two cost components: (1) what the trial court termed "remedial action costs," i.e., the costs for cleaning up contamination from the DOE enrichment facilities, and (2) the costs of disposing of depleted uranium tails. Then, in February 2001, the utilities argued for the first time that the government had improperly included two other cost components in calculating the price of enrichment services during the transition period: (1) $773 million in imputed interest on the Gas Centrifuge Enrichment Project ("GCEP"), and (2) $394 million in costs that, according to the plaintiffs, related only to the production of high-assay uranium for governmental (mostly military) applications.
 
 
 8
 After trial, the Court of Federal Claims held that the government had improperly included the remedial action and depleted uranium costs in the price of enrichment services, and it awarded damages to the utilities in the amount that those costs added to the price of enrichment services during the transition period. The court refused to grant recovery on the imputed interest and high-assay uranium claims, however, on the ground that the utilities had delayed unreasonably in presenting those claims and that the government had been prejudiced by the delay. Finally, the trial court held that the Contract Disputes Act did not apply to the contract, and that the utilities therefore were not entitled to recover interest from the date their claims were submitted.
 
 
 9
 The government appeals from the judgment awarding damages for breach of contract. The utilities cross-appeal the court's rulings that the contracts are not covered by the Contract Disputes Act and that the utilities are barred from recovering on two theories because those theories were raised too late.
 
 
 10
 * The government has not appealed the trial court's finding that it improperly included the remedial action and depleted uranium costs in the price for enrichment services, but it challenges the award of damages to the utilities. According to the government, the utilities should not have been awarded damages for two reasons: (1) because DOE was not limited to a cost-recovery basis for pricing its enrichment services during the transition period, and (2) because the price for the government's enrichment services would have been the same even if the costs that the trial court disallowed had been omitted in calculating the price of the enrichment services.
 
 
 11
 The trial court correctly rejected the first argument. Even though the statute that required pricing to be based on cost recovery was repealed in October 1992, the contract required DOE to determine charges for enrichment services "in accordance with the established DOE pricing policy for such services," and the DOE regulations that set forth DOE's pricing policy were still in effect throughout the transition period. The fact that the statute that required DOE to employ that pricing policy had been repealed does not alter the fact that the policy remained in place until the enrichment operation was transferred to USEC on July 1, 1993. The government therefore cannot prevail on its contention that throughout the transition period DOE had no pricing policy and the only constraint on its pricing decisions was the contractual ceiling price.
 
 
 12
 The government's second argument has more force. Under its established pricing policy, DOE was required to price enrichment services so as to recover "appropriate government costs over a reasonable period of time." 10 C.F.R. § 762.5 (1988). As of the beginning of Fiscal Year 1993, there was a large cumulative unrecovered loss from DOE's operations. The government argues that even after eliminating the remedial action and depleted uranium costs, there was still a large cumulative unrecovered loss that DOE was entitled to recover through enrichment charges. Accordingly, the government contends that even without including the environmental remediation and depleted uranium costs, the price for enrichment services during the transition period would have remained at the Fiscal Year 1993 price of $125 per SWU.
 
 
 13
 The trial court did not accept the government's legal theory. In response to the government's argument that costs other than remedial action and depleted uranium costs would have justified a price of $125 per SWU during the transition period, the court stated that "[t]o sanction an approach that allows DOE to take the position, with the full benefit of hindsight, that a substitute hypothetical analysis could have resulted in the same contract price anyway does violence to the established DOE pricing policy. Defendant cannot play a shell game with cost recovery."
 
 
 14
 The court's analysis does not fully respond to the government's argument as to remedy. The government's argument is not that it is entitled to engage in a "substitute hypothetical analysis." Instead, it argues that because the ceiling price was well below the total amount of DOE's appropriate costs, eliminating the costs that the court ruled inappropriate would not have reduced DOE's appropriate costs below the ceiling price and thus would not have resulted in a reduction of the price DOE was authorized to charge. On that issue, the government is entitled to a ruling from the trial court as to whether DOE had sufficient appropriate costs to justify a price at or near the ceiling price. If the court agrees with the government that DOE had such appropriate costs that could properly be included in the enrichment price during the transition period, the improper inclusion of remedial action and depleted uranium costs would not have caused the utilities any injury and thus would not support an award of damages.
 
 
 15
 The utilities assert that there is no need for a remand because the trial court has already rejected the government's factual submission that there were other appropriate government costs that would have allowed the government to keep the price at or near the ceiling price. We disagree. The trial court did not make any findings as to the government's factual argument that there were other appropriate costs that would justify the price charged during the transition period. We therefore remand for the trial court to determine whether the total amount of the appropriate government costs that could properly be considered in setting the price for Fiscal Year 1993 would justify the price of $125 per SWU, and if a lower price would have been required, how much lower that price would have been.
 
 
 16
 An issue that is likely to arise on remand is whether the government can justify the transition period price based on the cumulative unrecovered losses in the enrichment operations account, to the extent that those losses constitute "appropriate costs" within the meaning of the DOE pricing policy. The utilities argue that it would be inconsistent with DOE's established pricing policy to set the price during the transition period to recover all the losses that had accumulated in the program over many years. The trial court correctly noted that the DOE pricing policy requires DOE to calculate its price on a basis that recovers appropriate costs "over a reasonable time." The court, however, did not directly address the issue of what a reasonable time would be in the context of the transition period and the termination of DOE's responsibility for administering the enrichment contracts as of July 1993. The parties did not brief that issue to us, and it is of sufficient complexity that we believe the best course is to leave the matter to the trial court for decision on remand.
 
 II
 
 17
 The trial court found that the utilities acted belatedly in raising their claims as to the costs for high-assay uranium and imputed interest on the GCEP, and that the government was prejudiced by the delay. The utilities argue that they raised those two claims at a reasonable time under the circumstances, and they contend that the government did not establish that it was prejudiced by the delay.
 
 
 18
 The trial court pointed out that the utilities obtained the discovery materials on which they based the two disputed claims in May 2000, but did not raise their claims as to those two cost items until February 26, 2001, less than two months before trial. Based on observations of the trial proceedings, the trial court concluded that "[o]n the short notice that was provided, government counsel could not possibly be prepared to challenge the deductive analysis used by [plaintiffs' expert] in developing an amount that represented High Assay Costs." The court likewise concluded that the prejudice to the government on the imputed interest claim was not purged at trial, despite government counsel's able cross-examination of the plaintiff's expert. The court's conclusions were based on its first-hand familiarity with the pretrial and trial proceedings.
 
 
 19
 The trial court did not abuse its discretion in refusing to address the utilities' challenges to the imputed interest and high-assay uranium costs. The trial court was uniquely well situated to assess the justification for the delay and the extent of the prejudice to the government, and the court's assessment of those factors was reasonable. We therefore reject the utilities' argument that it was error for the court to refuse to address the merits of their challenges to the imputed interest and high-assay uranium cost claims based on the delay in raising them.
 
 
 20
 While we hold that the utilities are not entitled to affirmative relief on those claims in the current posture of the case, their rights with respect to those claims may be affected by the proceedings on remand. In raising the issue of remedy in its own appeal, the government apparently relies on the imputed interest and high-assay uranium costs as "appropriate costs" that, together with other costs, would have justified DOE's price of $125 per SWU during the transition period even without including the remedial action and depleted uranium costs. To the extent that the government on remand relies on the imputed interest and high-assay uranium costs as part of its challenge to the judgment in favor of the utilities, it will be necessary for the court to rule on the merits of those issues. If the court does so, and if it rejects the government's argument as to the appropriateness of those costs in whole or in part, the court's ruling not only would affect the government's argument as to remedy, but also would entitle the utilities to an adjustment of the underlying judgment in their favor. The government cannot seek an adjudication of the appropriateness of those costs for its own purposes while preventing the utilities from obtaining the benefits of that adjudication if it is favorable to them. Whether additional trial proceedings should be conducted to permit further development of the issues of imputed interest, high-assay uranium costs, and other claimed appropriate costs is a matter for the trial court to decide in the exercise of its discretion.
 
 III
 
 21
 Prior to trial, the government argued that the court lacked jurisdiction to hear this case under either the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613, or the Tucker Act, 28 U.S.C. § 1491(a). The trial court held that it had jurisdiction under the Tucker Act, but that it lacked jurisdiction under the CDA. The utilities appeal the court's ruling with respect to the CDA. The issue is important because the CDA would permit the utilities to recover interest running from the date their claims were submitted, while the Tucker Act would not.
 
 
 22
 The utilities argue first that the CDA should apply because the contract itself provides that "[t]his contract is subject to the Contract Disputes Act of 1978." Contractual language, however, cannot confer jurisdiction. See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701-02, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (jurisdiction is "limited to those subjects encompassed within a statutory grant of jurisdiction.... [N]o action of the parties can confer subject matter jurisdiction upon a federal court"); RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1461 (Fed. Cir.1998); Gould v. Control Laser Corp., 866 F.2d 1391, 1393 (Fed.Cir.1989). The reference to the CDA in the contract therefore did not give the trial court CDA jurisdiction over the utilities' claims if it was not otherwise authorized.
 
 
 23
 The utilities next argue that in our previous decision in this case, Florida Power & Light Co. v. United States, 198 F.3d 1358 (Fed.Cir.1999) ("Florida Power I"), we applied the CDA to the enrichment contracts and that the trial court was bound by that decision. The trial court correctly recognized that we did not directly address the question of CDA jurisdiction in Florida Power I. The argument in that case centered on whether the utilities' failure to adhere to the CDA dispute process barred them from presenting certain claims as a matter of res judicata or collateral estoppel. Although we referred to the CDA, our discussion concerned whether the utilities were barred by the doctrine of res judicata, and the question whether the trial court had jurisdiction under the CDA was neither raised nor decided.
 
 
 24
 When a court does not address the question of jurisdiction, the court's decision is not binding on the jurisdictional issue. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 119, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); Lowry v. Int'l Bhd. of Boilermakers, Iron Shipbuilders & Helpers of Am., 259 F.2d 568, 575 (5th Cir.1958). The trial court was therefore correct that our prior decision did not compel it to apply the CDA to the contracts before it.
 
 
 25
 The CDA applies to contracts entered into by an executive agency for:
 
 
 26
 (1) the procurement of property, other than real property in being;
 
 
 27
 (2) the procurement of services;
 
 
 28
 (3) the procurement of construction, alteration, repair or maintenance of real property; or
 
 
 29
 (4) the disposal of personal property.
 
 
 30
 41 U.S.C. § 602(a). By its terms, the CDA does not apply to the provision of services by the government, but only to the procurement of such services. The trial court found that the government had contracted to furnish enrichment services and that the contract therefore did not fall within the scope of the CDA. The utilities argue that the enrichment contracts actually involved the government in the procurement and disposal of personal property and that the contracts therefore fall within the CDA.
 
 
 31
 To determine whether the CDA applies to the enrichment contracts, it is necessary to understand how the enrichment process functioned under the contracts. The contracts required the utilities to furnish the government with unenriched or natural uranium, known as "feed material." Feed material typically consists of 0.7 percent U[235] isotope, with the remainder consisting of the U[238] isotope. Under the contracts, title to the feed material passed to the government at the time of delivery.
 
 
 32
 In the uranium enrichment process, feed material is heated until it becomes a gas. The gas is then pressurized and forced past porous metal barriers. The lighter U[235] diffuses through the barriers more readily than the heavier U[238]. The separation factor is very small, but by repeating the diffusion process over and over, the uranium can be enriched to a value chosen by the customer utility, generally until the U[235] isotope constitutes 3-5 percent of the uranium. Once the uranium has reached the desired enrichment level, the gas is cooled until it becomes a solid. The end products are enriched uranium, which is used for fuel, and depleted uranium tails.
 
 
 33
 The enrichment contracts provided that when DOE delivered the enriched uranium to the utility, the utility would take title to the enriched uranium. The utility was given the option of taking title to the tails, but apparently the utilities never exercised that option, and it was left to DOE to dispose of the depleted tails.
 
 
 34
 The contracts provided that the utilities would be charged for the enrichment services based on the amount of energy needed to enrich the uranium to the desired level. The SWUs, on which the enrichment price was based, measured the amount of energy required for the enrichment of each utility's uranium. The number of SWUs needed to enrich uranium to a given level was not constant, but varied depending on the amount of feed material used. The record at trial reflects that when the cost of feed material was low relative to the cost of electricity, DOE could use more feed material and less energy to produce the same amount of enriched uranium. Although that method produced more residue, and that residue contained U[235] that could have been removed with more effort, the method produced the desired amount of enriched uranium at lower cost to DOE.
 
 
 35
 The contracts also allowed the utilities to make a similar tradeoff. If a utility company had access to inexpensive uranium, it could provide DOE with a larger amount of feed material and instruct DOE to extract less of the U[235] from the material, thus ensuring that DOE would use fewer SWUs to produce the desired amount of enriched uranium. Because the utility was charged based on the number of SWUs necessary to enrich the uranium to the chosen level, the cost to the utility was lower.
 
 
 36
 According to the utilities, the enrichment contracts define a transaction with four separate components: (1) the delivery of feed material to the government; (2) the enriching process carried out by DOE; (3) the delivery of enriched uranium to a utility; and (4) the retention of the tails. The utilities view the first component of the transaction as the procurement of property by the government, and thus an act that falls within the scope of the CDA. They point out that title to the feed material passed to the government at the time of delivery, and that the feed material provided by the customer utility was commingled with feed material supplied by other customers and by the government itself. The utilities admit that the second component, taken in isolation, would amount to the provision of services by the government, beyond the scope of the CDA. They view the third component as the disposal of property by the government that falls within the CDA. Once again, the utilities emphasize that title to the uranium was transferred, this time from the government to the customer, and that the enriched uranium delivered to the customer was not necessarily produced from the particular feed material it delivered. Finally, the utilities assert that because the customers did not exercise their option to take title to the tailings, the fourth component of the transaction is best viewed as another procurement of property by the government. Thus, the utilities argue that in light of Bonneville Associates v. United States, 43 F.3d 649 (Fed.Cir.1994), and Forman v. United States, 767 F.2d 875 (Fed.Cir.1985), the CDA applies to the contract because it applies to at least a portion of the contract.
 
 
 37
 The government responds that the contracts are for the provision of enrichment services, as the contract language states. See Art. II ("This [contract] represents a 30-year obligation for the provision of enrichment services by DOE."); Art. III.1.a ("DOE shall furnish to the Customer during the term of this contract, and the Customer shall purchase from DOE ... the Customer's requirements for enrichment services."); Art. IV.1 ("The charges to be paid to DOE for enrichment services provided to the Customer...."). The government contends that transfer of title during the time the uranium was being enriched is not dispositive, noting that we have referred to the temporary title transfer as a "technicality." Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1355 (Fed.Cir.2001) (en banc).
 
 
 38
 It seems clear that if the government purchased natural uranium directly from a third party, enriched the uranium, and sold it to the customer utilities, the contracts would be for the disposal of personal property and would be covered by the CDA. It seems equally clear that if the government simply enriched each utility's uranium for a fee, it would be providing a service, not disposing of personal property.
 
 
 39
 In light of the evidence that DOE used feed material from other customers, and sometimes its own feed material, to fulfill a particular enriched customer's order of enriched uranium, this case does not fall neatly into either the above categories, but it is closer to the latter. The nature of the contractual pricing scheme, in particular, persuades us that the transaction is properly characterized as a service rather than a sale. Because the government's fee for the enrichment service was based on the number of SWUs needed to produce the enriched uranium, two utilities could obtain the same amount of enriched uranium but pay significantly different prices. A utility that chose to deliver more feed material to the government would obtain the same amount of enriched uranium but at a lower price than another utility that delivered less feed material, because the enrichment process in the second case would require more SWUs. In light of the pricing mechanism, the transaction is best characterized as a service provided by the government (the provision of a set amount of enrichment service for a particular price) rather than as a purchase or sale of personal property (the provision of a set amount of enriched uranium for a particular price).
 
 
 40
 The fact that DOE would not necessarily use a particular utility's feed material to produce that utility's enriched uranium is simply a consequence of the fact that feed material is fungible and there would be no reason to segregate it in the enrichment process. The fact that DOE would sometimes add its own feed material to the process was simply a way for DOE to reduce its costs for the enrichment service if the market price of uranium was favorable. Neither of those features alters the essential nature of the transaction as the provision of enrichment services for a price.
 
 
 41
 The Forman and Bonneville cases on which the utilities rely are inapposite. In Forman, the court held that a contract creating a leasehold interest in property was subject to the CDA because the act of entering into a lease does not constitute "the procurement of ... real property in being" as that phrase is used in the CDA. The court in Forman further noted that the lease was part of a larger construction agreement to which the CDA plainly applied. It explained that Congress could not have intended to create CDA jurisdiction over the contractor's obligations on the construction portion of the agreement but not over the government's obligations on the lease portion of the agreement. 767 F.2d at 879. Bonneville involved a contract that related partly to the acquisition of real property and partly to the repair and alteration of the property. Although the first portion of the contract, standing alone, would not have fallen within the CDA, the second would. Noting that the dispute in the case related to the repair and alteration portion of the contract, the court held that the case fell within the reach of the CDA. 43 F.3d at 654.
 
 
 42
 None of the analysis in Forman and Bonneville is of any assistance to the utilities because this is not a case in which one portion of the contract is subject to the CDA and another portion is not. Contrary to the utilities' contention, the enrichment contracts are properly viewed as involving a single transaction, not separable transactions, as was the case in Bonneville. As we have noted, the transfers of title to the uranium, on which the utilities rely for their analysis, do not affect the true nature of the transaction. Because each utility obtained the enriched product of its uranium (or other fungible uranium) after the enrichment process was completed, the title transfer had no effect other than temporarily changing the legal status of the uranium during the enrichment process. Thus, the enrichment contracts are best characterized as contracts for services; the trial court therefore correctly held the CDA inapplicable.
 
 
 43
 The utilities' final argument is that even if the CDA does not apply, they are entitled to recover interest running from the date their claims were submitted because paragraph 7(h) of the enrichment contracts so provides. Although the utilities raised that issue belatedly, this case is being remanded to the trial court for further proceedings, and if a final judgment is entered in the utilities' favor, they can argue to the trial court at that time that they are entitled to interest based on paragraph 7(h) of the enrichment contracts. The fact that they relied on the CDA rather than the contract in seeking interest on the first judgment does not preclude them from asserting a contractual right to interest if there is a new judgment on remand.
 
 
 Vacated and Remanded.
 
 
 
 Notes:
 
 
 [1]
 The contractual ceiling price for Fiscal Year 1993 was $125.34. Neither party has suggested that there is any legal significance to the 34 cent difference between the actual price and the ceiling price; rather, they have both treated the $125 price as equivalent to the ceiling price, so we do the same