ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Lee's Ford Dock, Inc. | ) ASBCA No. 59041 |
| | ) |
| Under Contract No. DACW62-1-00-0105 | ) |

APPEARANCES FOR THE APPELLANT:     Alan I. Saltman, Esq.
                                   Evangelin L. Nichols, Esq.
                                     Smith, Currie & Hancock LLP
                                     Washington, DC

                                   Karl F. Dix, Jr., Esq.
                                     Smith, Currie & Hancock LLP
                                     Atlanta, GA

APPEARANCES FOR THE GOVERNMENT:    Thomas H. Gourlay, Jr., Esq.
                                     Engineer Chief Trial Attorney
                                   Thomas M. Browder III, Esq.
                                     Engineer Trial Attorney
                                     U.S. Army Engineer District,
                                     Nashville

## OPINION BY ADMINISTRATIVE JUDGE CLARKE ON THE GOVERNMENT'S MOTION TO DISMISS

The United States Army Corps of Engineers (COE) moves to dismiss this appeal , alleging that Lee's Ford Dock, Inc. (Lee's Ford) raised a new claim for the first time on appeal, failed to certify the new claim, and filed the claim more than six years after accrual. We have jurisdiction pursuant to the Disputes clause of the lease at issue and the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We grant the motion on the first basis.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION[1]

1. The COE and Lee's Ford entered into Lease No. DACW62-1-00-0105 on 29 August 2000 for a commercial concession (marina) at Wolf Creek Dam–Lake Cumberland project, Kentucky, commencing on 1 September 2000 and lasting

---

[1] The COE's motion includes numerous other facts relating to bankruptcy and other matters that are not relevant to the central issue in the motion for the Board to decide.

25 years (R4, tab 3 at 1, 17). Paragraph 32 of the lease, the Disputes clause, stated that, except as provided in the CDA, all disputes arising under or related to the lease were to be resolved under this clause and the provisions of the CDA. The Disputes clause provided that claims were to be submitted to the district engineer. The district engineer's decision was to be final unless the lessee appealed as provided in the CDA. *See* 41 U.S.C. § 7104. Claims over $100,000 required certification. (*Id.* at 14-15)

2. The lease provided that the United States had the right "to manipulate the level of the lake or pool in any manner whatsoever...and the lessee shall have no claim for damages on account thereof against the United States" (R4, tab 3 at 6). On 19 January 2007 the COE decided that the dam was at high risk of failure and emergency measures were necessary "to reduce imminent risk of human life, health, property, and severe economic loss" (R4, tab 15 at 1). The COE concluded that it would incrementally lower the "pool" to elevation 680 to achieve maximum risk reduction while continuing hydropower and water supply operations (*id.*).

3. On 12 July 2007, as a result of lowering the water level in the "pool," the COE reduced rent payments to one dollar for the period 1 July 2007 through 30 June 2008 (R4, tab 7). Regular rents were reinstated on 1 July 2008 (gov't mot. at 4, ¶ 15).

4. On 18 January 2013, Lee's Ford's attorney emailed a claim to the COE's district engineer and on 19 January 2013 a copy of the claim was placed in the U.S. mail (gov't mot. at 4, ¶ 18; app. opp'n at 2, ¶ 18). The claim includes the following:

> As discussed below, Lee's Ford asserts that the very purpose of the Lease contract has been frustrated by the now six-year drawdown of Lake Cumberland caused by the Corps' decision to lower the Lake on January 19, 2007. As a result, Lee's Ford demands that the Lease contract be reformed in one or more of the following ways to compensate Lee's Ford for the damages it has incurred due to the drawdown: (a) rent owed by Lee's Ford to the Corps under the Lease should be fully abated until such time as the abated rent equals at least $4,000,000.00, which is the amount of Lee's Ford's disaster loan debt to the U.S. Small Business Administration ("SBA"); (b) the Corps will pay the SBA the sum of $4,000,000.00, plus all accrued interest and loan fees, in satisfaction of Lee's Ford's disaster loan debt to neutralize the detrimental effect that the frustrated contract continues to have on Lee's Ford; and/or (c) the Corps will commit to working with the SBA to develop a federal government policy that

2

would allow the SBA to hold the disaster loan debt fully satisfied by offsetting Lee's Ford's damages arising out of its frustrated Lease against its disaster loan debt under the unitary creditor doctrine.

....

## B. THE LOWERING OF LAKE CUMBERLAND

As you are aware, Lake Cumberland is dammed by Wolf Creek Dam. On January 19, 2007, LTC Steven J. Roemhildt and Brigadier General Bruce A. Berwick signed the Memorandum for Record on the subject of "Wolf Creek Dam Interim Risk Reduction Measures" (the "January 19th Memo"), which discussed concerns with the possible failure of Wolf Creek Dam and the need to repair it. The January 19th Memo concluded that the Lake must be substantially lowered in order to accomplish the necessary repairs. Recognizing the impacts of the lowering on the Lake region, the Memo provided that "[p]lans are being developed to mitigate to the maximum extent possible those impacts." Memo, p. 14. The Memo also included a commitment that the "Nashville District [of the Corps] will work with Lake Cumberland stakeholders to minimize to the extent practicable the impact to recreation," which was said to include the "relocation of marinas" and the "relaxation of user fees." *Id.* at 15. On January 22, 2007, the Corps began to lower the Lake water levels by a total of 43 feet.

....

As the District Engineer for the Nashville District of the Corps, Lee's Ford is submitting this letter to you to formally assert its "claim" against the Corps and to demand reformation of the frustrated Lease contract in such a manner as to compensate Lee's Ford for the damages it has incurred as a result of the drawdown through payment, the adjustment of Lease terms, and/or similar relief relating to the Lease....

As the lessee under the Lease, Lee's Ford expected to have a certain water level at its dock and the business

3

traffic that has historically followed that water level. While the Lease does contemplate that the Corps has the right "to manipulate the level of the lake or pool," the parties could not have envisioned at the time that they entered into the Lease that the Lake would be drawn down to such an extreme degree for such a long period of time, as the Lake has only been lowered to 680' once in its more than fifty year history. Instead, all that the parties could have anticipated was perhaps a short-term drawn [sic] down for repairs to the Dam – not a seven-year term of drastically lowered levels that required Lee's Ford to relocate its entire dock system within the leased area. [Footnotes omitted]

(R4, tab 8 at 1, 2, 5) The claim included other facts relating to SBA involvement (*id.* at 2) and COE actions following the lowering of the lake (*id.* at 3).

5. By a 26 August 2013 final decision, signed by both the district engineer and the contracting officer (CO), sent by certified mail, the COE denied the claim (R4, tab 2). Lee's Ford received the final decision on 29 August 2013 (Bd. corr. file). On 27 November 2013, Lee's Ford timely appealed the final decision to the Board (R4, tab 1 at 1). Lee's Ford's complaint, filed with its appeal, included one count, Breach of Contract–Nondisclosure of Superior Knowledge, and itemized alleged breach damages of $5,755,212.

6. On 2 December 2013, the Board docketed the appeal as ASBCA No. 59041.

7. On 5 February 2014, the COE filed its motion to "dismiss appellant's complaint," which it referred to in the body of the motion as one to dismiss the appeal. We treat the motion as one to strike the complaint. The COE contends that the claim for "nondisclosure of superior knowledge was raised for the first time on appeal" and was "never presented to the [CO] for decision as required by the CDA." (Gov't mot. at 7, ¶¶ 34, 35)

8. On 21 March 2014, Lee's Ford filed its opposition to the COE's motion. On 29 April 2014, the COE notified the Board that it had decided not to file a reply to the opposition.

4

## DECISION

### Initial Jurisdictional Considerations

The leases's Disputes clause invokes the CDA. Parties cannot, by contractual agreement, confer CDA jurisdiction upon the Board if CDA jurisdiction does not otherwise exist. *See Florida Power & Light Co. v. United States*, 307 F.3d 1364, 1371 (Fed. Cir. 2002); *Patriot Pride Jewelry, LLC*, ASBCA No. 58953, 2014 ASBCA Lexis at *15 (9 June 2014). However, the Board has jurisdiction to entertain this appeal under the Disputes clause alone, which incorporates procedures for appeal to the Board. *See, e.g., Donald M. Lake, d/b/a Shady Cove Resort & Marina*, ASBCA No. 54422, 05-1 BCA ¶ 32,920. We also have jurisdiction under the CDA because a lease involves the disposal of personal property within the CDA's coverage. 41 U.S.C. § 7102(a)(4); *Arnold V. Hedberg*, ASBCA Nos. 31747, 31748, 90-1 BCA ¶ 22,577; *accord New London Development Corp.*, ASBCA No. 54535, 05-2 BCA ¶ 33,018; *see also Forman v. United States*, 767 F.2d 875 (Fed. Cir. 1985).

### Jurisdictional Dispute at Issue

Both parties correctly recognize that whether the complaint asserts a new claim or not depends, in part, on if it relies on the same "operative facts" cited in the claim. The alleged new claim in this case is failure to disclose superior knowledge.

The elements of proof of superior knowledge are:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012). As reflected in these elements of proof, the "operative facts" alleged in the claim must somehow communicate to the CO a disparity in knowledge between the parties at contract award of which the government was aware. The theory of superior knowledge is unique in that it normally relies on "operative facts" in existence *before award. Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007) (addressing Board's determinations about the contractor's knowledge during "pre-award period" and "vital knowledge or the opportunity to obtain that knowledge *before* contract entry" (emphasis added); *Bannum, Inc. v. United States*, 80 Fed. Cl. 239, 247 (2008) (A superior knowledge claim ordinarily relates to knowledge regarding contractual

5

specifications that the government failed to impart to a contractor prior to the contractor's agreement to undertake performance of a contract); *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 721 (2005) ("When analyzing a claim that the government breached its duty to disclose superior knowledge, '[t]he court...must focus its inquiry on the government's knowledge at the time of contracting and its relationship to the contractor's lack of knowledge)'" (citations omitted). It is the pre-award disparity in knowledge that distinguishes the operative facts pertinent to superior knowledge allegations from those of other cases of action.

In *Todd Pacific Shipyards Corp.*, ASBCA No. 55126, 06-2 BCA ¶ 33,421, cited by appellant, the contract involved work related to maintenance of U.S. Navy vessels. In order to perform the contract Todd had to maintain a large dry dock. After award the Navy transferred several of the vessels and decommissioned another resulting in less work for Todd. Todd's 18 June 2004 certified claim referred to its 5 March 2004 "Drydock No. 3 Settlement Proposal" that alleged the following operative facts:

> Todd stated that, upon concluding contract negotiations in June, 2001, it had undertaken a five-year repair and maintenance project to ensure that dry dock No. 3 would remain certified and ready to support all scheduled and potential dockings covered by the contract. It alleged that, since nearly all of its non-Navy customers could be accommodated on a mid-sized dry dock, its continuing need for a dock as large as dry dock No. 3 was driven by this AOE contract and the Navy's representations and commitments as to the future work. It alleged that the project cost was $16 million; it was clearly understood that the Navy would pay for the dry dock costs through direct charges or as unrecovered costs included in overhead; and Todd had engaged in the project because of the Navy's representations and commitments and the $8.9 million in support Todd expected from it. However, after signing the contract, the Navy decided to transfer two vessels elsewhere and to decommission the U.S.S. Sacramento early. Todd alleged that it and the Navy had been discussing the need to change Todd's dry dock No. 3 cost recovery methodology for three years, and that the Navy's decisions had damaged it.

*Todd*, 06-2 BCA ¶ 33,421 at 165,684. After the claim, final decision and appeal, Todd filed a complaint with seven counts, one of which was superior knowledge that had not been asserted in the claim. We held:

> Although many of appellant's legal theories of recovery
> remained the same, it expanded upon them in the
> complaint to articulate such theories as breach of contract
> and superior knowledge. However, appellant essentially
> alleged the operative facts necessary to those theories in its
> 28 March 2005 claim, in the 18 June 2004 claim
> referenced therein, and in the 5 March 2004 submission to
> which the 18 June claim, in turn, referred.

*Todd*, 06-2 BCA ¶ 33,421 at 165,688. It is significant that the operative facts stated in the 5 March 2004 settlement proposal included Navy pre-award "representations and commitments" concerning the amount of work to be performed under the contract. We found that these facts were sufficient to support the added legal theory of superior knowledge.

We see a different result in *Advanced Technologies & Testing Laboratories, Inc.*, ASBCA No. 55805, 08-2 BCA ¶ 33,950 (ATTL), which involved a 21 September 2002 COE delivery order contract with a small business for sampling and testing dredged material. After award ATTL submitted its "initial demonstration of capability data" and "standard operating procedures" on 21 February 2003, 5 September 2003, 30 December 2003, and 18 June 2004 to the Environmental Protection Agency (EPA) for approval. On 12 August 2004 the EPA found the last submission deficient, as it had all of the previous submissions. As a result, the COE decided not to order more than the contract's minimum quantity of $5,000 worth of work. ATTL submitted a claim alleging constructive change based on a 29 October 2002 letter and the EPA's "improper" rejection of its submissions. During discovery ATTL obtained a memorandum written by Ms. Beth Nash on 4 December 2001, before contract award, which stated the contract should not be a Small Business set-aside, because the contract required a high degree of precision and would be difficult for a small business to perform. ATTL also obtained a December 2001 memorandum written by Mr. John Hartmann agreeing with Ms. Nash. ATTL moved to amend its complaint to allege a superior knowledge cause of action. The Board held, "[a]ppellant's original claim alleged operative facts limited to two theories of recovery – the government changed the contract and the EPA review of appellant's submittals was faulty." *Advanced Technologies*, 08-2 BCA ¶ 33,950 at 167,975. The Board held, "[w]e do not have jurisdiction to the extent that the underlying bases for the superior knowledge and commercial impracticability theories are the information in the Discovery Documents (*i.e.,* a small business would find it difficult to complete the contract)". *Id.* The operative facts in the claim related to a 29 October 2002 letter and EPA rejections of ATTL's submissions on 21 February 2003, 5 September 2003, 30 December 2003, and 18 June 2004. It is significant that all of the operative facts alleged in the claim were well after the 21 September 2002 award of the contract. Again, the theory of superior knowledge requires an allegation of operative facts occurring in the pre-award period.

*Shams Engineering & Contracting Co. and Ramli Co.,* ASBCA Nos. 50618, 50619, 98-2 BCA ¶ 30,019, involved a United States Agency for International Development (USAID) contract to construct residential buildings in Gaza. Shams submitted claims alleging "unfair settlement of claims submitted to USAID," "extra difficulties which cost us more than ABB SUSA on purchasing materials from Israel because of the [border] closure" and "delay of paying the amount of Claims on time 'interest' as per FAR (Clause 52.233-1)." *Shams,* 98-2 BCA ¶ 30,019 at 148,523. Appellant appealed the final decision denying the claims and then moved to amend its complaint to add six counts. Count 2 was breach of the duty to disclose superior knowledge. The Board held:

> In Count 2, appellants contend that USAID breached its duty to disclose information vital for appellants' performance under the contracts, and that it knew or should have known that appellants did not possess the information. That information allegedly included (a) the volatile political and economic conditions in the region, which USAID should have anticipated, (b) the terms of the contract written in a language understandable to appellants and the physical inclusion of FAR provisions rather than their incorporation by reference into the contract, and (c) the business and accounting standards to which USAID would hold appellants. Those contentions are essentially different than those presented to the contracting officer in appellants' claims seeking equitable adjustments. With respect to Count 2, appellants' motion to amend is denied.

*Shams,* 98-2 BCA ¶ 30,019 at 148,526. As before, it is significant that none of the operative facts cited in the claim involved facts reflecting a disparity of knowledge between the government and the contractors before award.

Court of Federal Claims cases in this area are also instructive. For example, in *Laidlaw Environmental Services (GS), Inc. v. United States,* 43 Fed. Cl. 44 (1999), which involved a waste disposal (magnesium batteries) contract, the parties filed cross-motions for summary judgment and the government filed a motion to dismiss for lack of jurisdiction. The motion to dismiss alleged that Laidlaw raised three theories of entitlement in its complaint that were not presented in its claim to the CO, including superior knowledge:

> As noted *supra,* the complaint in this court asserts three basic theories of liability, *i.e.,* i) breach of contract, ii) constructive change, and iii) failure to disclose superior

knowledge. In contrast, the claim previously filed before the contracting officer asserted, in essence, that–i) CLIN 0502 cannot be used on the contract because it is for state regulated batteries only; ii) the tests indicating the toxicity of magnesium batteries are disputable; iii) magnesium batteries are not regulated in North Carolina; iv) the use of CLIN 0502 in the contract was erroneous; and v) such use constituted a change in the contract.

*Laidlaw*, 43 Fed. Cl. at 50. The operative facts supporting the claim were:

> i) The state of North Carolina *does not regulate magnesium batteries* so that the use of CLIN 0502 was erroneous;
> ii) The basis of the tests finding the magnesium batteries to be *hazardous* is disputable;
> iii) The government changed the terms of the contract when it informed Laidlaw it would use CLIN 0500 or CLIN 0502 in delivery orders because magnesium batteries exhibited "toxicity characteristics for chromium" making them a RCRA regulated waste;
> iv) CLIN 0502 cannot be used on the contract because it is for state regulated batteries only and magnesium batteries are not regulated in North Carolina; and
> v) A new "RCRA" CLIN with a unit price based on supportable data must be added to the contract.

*Laidlaw*, 43 Fed. Cl. at 48. Focusing on the superior knowledge theory, the court held:

> The nature of this last claim is an assertion regarding *what* the government and Laidlaw knew in regard to the toxicity of magnesium batteries, and *when* they knew it. While such a claim before the contracting officer need not be legally precise, if the general nature of this claim had been presented to the contracting officer, we would expect a statement in Laidlaw's claim to the effect that Laidlaw was *unaware* of the government studies finding that magnesium batteries were hazardous under the RCRA; that the government did not inform Laidlaw of the results of such studies; and that Laidlaw was damaged by this lack of, or withheld, knowledge. This claim is thus a new claim, and a variance, based on "operative facts" beyond those

9

> presented for the contracting officer's final decision and
> must, therefore, be dismissed.

*Laidlaw*, 43 Fed. Cl. at 50. Significantly, it was the lack of operative facts reflecting that Laidlaw was "unaware" of information the government was aware of that caused the court to dismiss. The court commented, "[n]o reasonable person could have inferred, from reading Laidlaw's claim before the contracting officer, that Laidlaw was alleging that the government had superior information that Laidlaw did not possess, which it had a duty to disclose." *Id.* at 51.

The common thread in these and other superior knowledge cases is their analysis of whether the operative facts in a claim to the CO communicated the disparity of knowledge between the contractor and the government before contract award. If they did, there is jurisdiction to consider the claim, if not, there is no jurisdiction. That is the standard we apply to Lee's Ford. The legal theories asserted in the claim are "frustration of purpose" and "reformation" (SOF ¶ 4). The claim cites the following material operative facts[2]:

- On 19 January 2007 a decision was made to lower the water level in the lake.
- Lee's Ford expected to have "a certain water level at its dock and the business traffic that has historically followed that water level."
- The parties could not have envisioned at the time they entered into the Lease that the Lake would be drawn down to such an extreme degree for such a long period of time, as the Lake has only been lowered to 680' once in its more than fifty year history.

(SOF ¶ 4) The last two bullets relate to pre-award knowledge.

The parties entered into the lease on 29 August 2000 (SOF ¶ 1). The decision to lower the water level was made over six years after the lease was executed[3] (SOF ¶ 2). While two of the operative facts in the claim deal with the parties' knowledge at award of the lease, they do not reflect the disparity of knowledge between the parties required to support a superior knowledge theory. Indeed, Lee's Ford's assertion that the parties could not have envisioned at the time they entered into the Lease that the lake would be

---

[2] The facts presented in the claim relating to the SBA and the Corps' mitigation efforts are not material to superior knowledge.

[3] We do not consider the fact that ownership of Lee's Ford changed in 2003 to be significant (R4, tab 4).

drawn down to such an extreme degree for such a long period of time communicates a common understanding that is inconsistent with the disparity of knowledge required for superior knowledge. We disagree with the implication in appellant's brief that it alleged facts supporting superior knowledge, "[f]irst, the claim letter certainly indicates that, prior to lease execution, the Corps did not provide Lee's Ford with any information about defects with the Wolf Creek Dam that were likely to result in major reconstruction." (App. br. at 15) Of critical importance is the complete absence of any assertion that the COE had information that appellant did not.

There is nothing in Lee's Ford's operative facts alleged in the claim that arguably supports the theory of superior knowledge. As in *Laidlaw*, no reasonable person could have inferred, from reading Lee's Ford's claim, that it was alleging the government had pre-award superior information that Lee's Ford did not possess. Accordingly, the complaint incorporated into the appeal constitutes a new claim that has not been presented to a CO for decision as required by the CDA, 41 U.S.C. § 7103(a)(1), we do not have jurisdiction to consider it, and we strike it.

Since we do not have jurisdiction over the superior knowledge count, we do not address the government's other two issues, failure to certify and timeliness.

CONCLUSION

For the reasons stated above, we strike the complaint as it relates to the theory of superior knowledge without prejudice to the filing of a proper claim with the CO.[4] The appeal, however, remains within the jurisdiction of the Board and Lee's Ford may amend its complaint to assert theories supported by the operative facts stated in the claim.

Dated: 23 July 2014

_____
CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

---

[4] Since this claim is not before us we express no opinion on any possible untimeliness of the filing of the claim, should such occur.

11

(Signatures continued)

I <u>concur</u>                                          I <u>concur</u>

MARK N. STEMPLER                        CHERYL L. SCOTT
Administrative Judge                        Administrative Judge
Acting Chairman                              Acting Vice Chairman
Armed Services Board                       Armed Services Board
of Contract Appeals                          of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59041, Appeal of Lee's Ford Dock, Inc., rendered in conformance with the Board's Charter.

Dated:


JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

12