**PSI ENERGY, INC., and Cincinnati Gas & Electric Co., Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

Nos. 96–371 C, 96–407.

United States Court of Federal Claims.

March 1, 2004.

Eric J. Marcotte, Winston & Strawn, LLP, Washington, DC, argued for plaintiffs.

James G. Bruen, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant.

## OPINION AND ORDER

BLOCK, Judge.

█ In this case, plaintiffs PSI Energy, Inc. ("PSI") and Cincinnati Gas & Electric Co. ("CGE") contend that the imposition by the Department of Energy ("DOE") of a monetary special assessment pursuant to the Energy Policy Act of 1992, 42 U.S.C. § 2297g–1(a) ("EPACT"), was contrary to the meaning and purpose of the statute and constituted an illegal exaction contrary to the Due Process Clause of the Fifth Amendment.[1] The need for a special assessment was the result of a noxious yet inevitable by-product of the "Atoms for Peace" program of the 1950's, radioactive contamination.

The program, established by President Dwight D. Eisenhower, was designed to promote peaceful uses of nuclear energy and takes its name from the President's December 8, 1953 "Atoms for Peace" speech before the United Nations. Concerned about the then-recent development of the thermonuclear hydrogenbomb and what Eisenhower termed the "Atoms for War" race with the now defunct Soviet Union, President Eisenhower advocated a policy for a peaceful use of atomic energy beneficial to agriculture, manufacturing, and civilian life in general. From that prescient policy address sprang a panoply of peaceful atomic programs, including the harnessing of the atom for consumer energy use under the aegis of the then U.S. Atomic Energy Commission ("AEC"), which was established by the Atomic Energy Act of 1954, Pub.L. No. 83–703, 68 Stat. 919 (codified as amended at 42 U.S.C. §§ 2011 et. seq. (2000)).

Spurred on by government incentives, a privatized nuclear industry emerged. Pursuant to the terms imposed by federal regulation, these utilities contracted with the AEC and its successor federal agencies (now the Department of Energy ("DOE")) to enrich uranium fuel (U–235) to the degree necessary to generate electricity from controlled fission. The contracts required the utilities to supply uranium to special federal facilities for enrichment processing, and pay for the degree of service required to enrich the uranium to the desired standard; the more U–235 isotopes produced by the enrichment process, the higher the price for the service. Under the contract, the price of the "enriched" uranium, and this is key, was equivalent to the cost of the service units needed to enrich uranium to the desired standard. The government was required by contract to supply the enrichment service and return or supply similarly enriched uranium to the utilities.

But even peaceful nuclear programs produce fallout. Enriching uranium contaminated the federal facilities. Proving correct Bob Well's quip that "[f]or every action there is an equal and opposite government program,"[2] EPACT was enacted in 1992 to recoup the cost of decontaminating or decommissioning the federal processing facilities which had provided uranium enrichment services. Although EPACT assessed utilities only for those remediation costs associated with the contamination caused by the enrichment of the utilities' uranium, the utilities challenged the retroactive special assessment on constitutional and other grounds. These challenges were rejected by the Court of Appeals of the Federal Circuit primarily in *Maine Yankee Atomic Power Co. v. United States*, 271 F.3d 1357 (Fed.Cir.2001), *cert. denied*, 535 U.S. 1095, 122 S.Ct. 2290, 152 L.Ed.2d 1049 (2002); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed.Cir. 2001)(*en banc*), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002);

---

1. See *Casa De Cambio Comdiv S.A., De C.V. v. United States*, 291 F.3d 1356, 1363 (Fed.Cir. 2002). An illegal exaction claim may be maintained when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed.Cir. 1996) (quoting *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967)).

2. From *The Quotations Page*, www.quotationspage.com.

*Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569 (Fed.Cir.1997), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998). But the fallout did not end there.

Plaintiffs here contend that the special assessments were improperly levied because EPACT "impose[s] the assessment upon whichever utility company eventually used the enrichment services," *Commonwealth Edison Co.,* 271 F.3d at 1333 (quoting *Yankee Atomic Electric Co.,* 112 F.3d at 1572), and they sold their *entire* stock of enriched uranium and, thus, never used the service for commercial purposes. Furthermore, they argue, even if EPACT can be construed in a way to impose on them the special assessment, it is an unconstitutional exaction. Defendant essentially counters that the Federal Circuit decisions cited above preclude plaintiffs' claims.

Plaintiffs' cases, which were subsequently consolidated at their request for convenience sake, were filed pursuant to 28 U.S.C. § 1491(a)(1), which grants the United States Court of Federal Claims jurisdiction upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States. Before the court is defendant's motion for summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC").

As will be explained more thoroughly below, plaintiffs' contention—the core of both their statutory and constitutional arguments—is that they are not responsible for any of the special assessment because they did not ultimately benefit from the uranium enrichment service, but rather sold the product of those services to other users on a secondary market at below-cost. This is too clever by half. Of course plaintiffs benefitted from the service they freely contracted for with the government. The resulting enriched uranium was theirs to use in any manner the law would allow, including secondary market transactions. Furthermore, under their contracts plaintiffs benefitted from an economic externality—an unpaid benefit representing the remediation cost of the radioactive contamination resulting from

the enriched uranium service. As will be shown, it was for the recoupment of this unpaid benefit that EPACT was enacted.

This court concludes that the DOE's calculation of plaintiffs' special assessment under EPACT was reasonable. It was based on the "secondary market" provision of EPACT. *See* 42 U.S.C. § 2297g–1(c). The assessment imposed by the DOE was a factor of the original contract price of the enrichment services provided to the plaintiffs, reduced by the extent to which plaintiffs passed these service costs on to customers when they sold them the enriched uranium. Since plaintiffs had, for business reasons, freely chosen to sell their enriched uranium for a price below the cost originally paid to enrich the uranium, the DOE's assessment was limited to the original cost of the enrichment service not passed on to plaintiffs' buyers. In other words, the buyers of the enriched uranium, not plaintiffs, had to pay the lion's share of the special assessment.

If plaintiffs would have sold the enriched uranium at a price reflecting the original cost of the enrichment service, they would have had to pay no special assessment. Because under the contracts plaintiffs purchased a service and not the enriched uranium itself, the DOE's calculation and imposition of the special assessment based on the price of enrichment services not sold along with the enriched uranium to the buyers, was neither irrational nor unconstitutional. All this will be explained more fully below. Accordingly, the defendant's motion will be granted, and judgment entered in favor of the United States.

## I. Background

The relevant facts of this case were derived from the pleadings, attachments, and submitted documents and are uncontested, unless stated otherwise. Prior to 1954, only the United States government could own and operate nuclear reactors. In 1954, the Atomic Energy Act was amended to authorize private ownership of nuclear reactors. Atomic Energy Act of 1954, Pub.L. No. 83–703, 68 Stat. 919 (codified as amended at 42 U.S.C. §§ 2011 *et. seq.* (2000)). It was not until 1964, however, that private ownership of enriched uranium was allowed with enact-

ment of what became section 161v of the amended Atomic Energy Act of 1954. *See* Private Ownership of Special Nuclear Materials Act, Pub.L. No. 88–489, 78 Stat. 602, 606 (1964) (codified as amended at 42 U.S.C. 2201 (2000)). Special facilities owned and operated by the federal government (the AEC until 1974, thereafter by the Energy Research and Development Administration until 1977 when the operations were administered by the DOE), hitherto solely for military purposes, provided uranium enrichment services to utilities.

In general, multi-year contracts were entered into between the federal government and certain utilities running nuclear reactors, whereby the utilities delivered low-grade uranium called "feed" material (in the form of uranium hexaflouride) to appropriate federal facilities for enrichment. The federal government returned enriched uranium (also in a form of uranium hexaflouride, but containing a higher percentage of the radioactive isotope U–235 than the feed material). *See generally Florida Power & Light Co. v. United States,* 307 F.3d 1364, 1371 (Fed.Cir. 2002). Uranium enrichment processing essentially consists of taking feed material and heating it until it becomes a gas. "The gas is then pressurized and forced past porous metal barriers. The lighter U235 diffuses through the barriers more readily than the heavier U238." *Id.* The continuous repetition of this diffusion process enriched the uranium to the level chosen by the utility. "Once the uranium has reached the desired enrichment level, the gas is cooled until it becomes a solid. The end products are enriched uranium, which is used for fuel, and depleted uranium [called] tails." *Id.* As a result of this enhancement process, the enriched uranium would have a concentration of the U–235 isotope above the naturally occurring percentage of 0.711%. The tails would have a concentration of the U–235 isotope that is lower than the 0.711%. Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss at 3.

The enriched uranium was to be used by the utilities in nuclear reactors to generate electricity from controlled fission chain reactions for use by commercial enterprises, pub-lic facilities, and consumers. Regulations established that the enrichment service would be calculated in "separative work units"("SWUs") and would be made available to qualified utilities pursuant to contract. Atomic Energy Commission, Uranium Enrichment Services, 31 Fed.Reg. 16,479 (Dec. 23, 1966); *See Florida Power & Light Co.,* 307 F.3d at 1366–67. The SWUs—the work necessary to enrich a quantity of uranium supplied by the utility—that is, the so-called "feed" material—were divided into two fractions, the "product" fraction containing a higher percentage of enriched U–235 than the feed material (*i.e.,* the percentile "purity" of the U–235 isotope or the "enriched" uranium), and the "tails" fraction (also referred to in term of its "assay" or weight) containing lower concentrations of U–235 (*i.e.,* the remainder or "spent" uranium). *See* Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss at 3.

The contracts specifically provided that the utilities supply the feed materials, which were then enriched for reactor use according to the SWUs needed to enrich the uranium to the purity or product fraction required by the utility in the contract. Contract for Furnishing Uranium Enrichment Services at 4 (hereinafter "Contract"); DOE Uranium Enrichment Criteria, 10 C.F.R. § 762.1 (1992); Second Am. Compl. at ¶¶ 21–24.[3] While the contracts called for the government facility to deliver the contracted-for enhanced uranium, the particular enhanced product ultimately delivered did not have to be derived from the corresponding feed material originally supplied by the utility, presumably because such enhanced uranium was "fungible" (*e.g.,* one piece of 24 karat gold is much the same as another, but more dear than 14 karat gold of the same mass). Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss at 4–5 n. 5. The contracts also allowed for the utilities to retrieve the spent uranium tails. DOE Uranium Enrichment Criteria, 10 C.F.R. § 762.12 (1992); *Florida Power & Light Co.,* 307 F.3d at 1372.

The contracts established that the price charge for the enrichment service would follow the "established [federal government] pricing policy" contained in the Standard Table of Enrichment Services as published in

---

3. Second Amended Complaint refers to both par-    ties' amended complaints.

the Federal Register and in effect at time of delivery. Contract at 11. The price was predicated upon the number of SWUs associated with enriching the quantity of uranium in a particular transaction as calculated by the tails assay produced from the amount of feed material originally provided. Second Am. Compl. at ¶¶ 22–24. In theory, enriching uranium to a lower tails assay (or the equivalent of a higher level of enriched U–235 produced) would require the expenditure of more SWUs, assuming the quantity of feed material were held constant. For example, enriching uranium to a tails assay of .2% would require more SWUs than enriching the same quantity to a tails assay of .3%. Hence, under the Standard Table of Enrichment Services, a utility contracting for uranium enrichment to a tails assay of .2% would be charged a higher number of SWUs than if it were to purchase enrichment services to a .3% tails assay. Second Am. Compl. at ¶ 25.

As a result of the uranium enrichment activities, the federal processing facilities became contaminated, although a goodly amount of the contamination was the result of weapons production and other defense-related activities. *Commonwealth Edison Co.*, 271 F.3d at 1331–32. In 1992, Congress enacted EPACT to rationalize the federal nuclear administrative and processing programs, as well as to ameliorate the problems of nuclear waste resulting from uranium enrichment.

As pertinent to the facts here, EPACT addressed the need to decontaminate and decommission the uranium enrichment plants. Since this decontamination and decommissioning fiscal problem was not recognized until the 1980's, the prices charged in the government's past uranium enrichment contracts had not accounted for the problem. *Id.; Yankee Atomic Electric Co.*, 112 F.3d at 1572. The cost for this clean-up was estimated at $20 billion over 40 years, which amounted to about $500 million per year, indexed to inflation. *Yankee Atomic Electric Co.*, 112 F.3d at 1572 (citing H.R.Rep. No. 474, pt. VIII, at 77 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2282, 2295). After hearing testimony from representatives of various domestic nuclear utilities and the DOE, Con-

gress established a Uranium Enrichment and Decontamination and Decommissioning Fund ("D & D Fund") as part of EPACT to accumulate the funds necessary for the cleanup of the uranium enrichment facilities. *Id.*

The D & D Fund consists of annual deposits in the amount of $480 million (adjusted for inflation), which collected, *in toto,* over a 15–year period would suffice to clean up the uranium processing facilities. 42 U.S.C. § 2297g–1(a). *See Commonwealth Edison Co.*, 271 F.3d at 1333; *Yankee Atomic Electric Co.*, 112 F.3d at 1572. The D & D Fund is derived from two sources: (1) up to $150 million is to be collected as a special assessment from domestic utility companies that had purchased the uranium enrichment services; and (2) the balance, at least $330 million, is to come from public funds appropriated by Congress, which is to pay for contamination primarily caused by the uranium processing for the military. *Yankee Atomic Electric Co.*, 112 F.3d at 1572. This meant the utilities' share "was limited to 32 percent even though the House Report concluded that '[h]istorical production from these plants ha[d] been divided almost evenly between the government and commercial sectors.'" *Commonwealth Edison Co.*, 271 F.3d at 1334 (quoting H.R.Rep. No. 102–274(I), at 144 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953, 1967). Each utility's share of the special assessment is based on the number of SWUs of government enrichment services that the utility purchased and did not resell prior to October 24, 1992. 42 U.S.C. § 2297g–1(c). Moreover, to assure some sort of proportionality, the Act provides that the amount of a utility's assessment is based on the percentage of SWUs it purchased from the DOE relative to the total number of SWUs produced by the DOE. 42 U.S.C. § 2297g–1(c). *See Yankee Atomic Electric Co.*, 112 F.3d at 1572.

Because this is the genesis of the dispute between the parties at bar, it is significant that the Energy Policy Act "imposes the assessment upon whichever utility company eventually uses the enhancement services." *Id. See also Commonwealth Edison Co.*, 271 F.3d at 1333. The literal language of the provision is as follows:

(1) a utility shall be considered to have purchased a separative work unit from the Department if such separative work unit was produced by the Department, but purchased by the utility from another source; and

(2) a utility shall not be considered to have purchased a separative work unit from the Department if such separative work unit was purchased by the utility, but sold to another source.

42 U.S.C. § 2297g–1(c)("secondary market" provision). The court in *Yankee Atomic Electric Co.* explained that this provision was "designed to take into account the secondary market that existed for uranium enrichment services, wherein some utilities purchased uranium work units from the government and resold them to other utilities." *Yankee Atomic Electric Co.*, 112 F.3d at 1572 n. 1. In rejecting the argument that relevant provisions of EPACT fell outside the sovereign acts doctrine [4] because it was enacted for the purpose of increasing the fixed-price enrichment contracts to the benefit of the "government-as-contractor," the court concluded that the legislation's overall aim was to benefit the public "by solving the problem of decontamination and decommissioning of uranium enrichment facilities." *Id.* at 1575. The court explained that contrary to the trial court's notion that the special assessment impermissibly targeted *only* those utilities which had contracted with the government:

> [T]he special assessment does not reach only those utility companies that previously contracted with the Government; it also reaches those utilities that purchased the services through the secondary market but had *no* contracts with the Government. Ironically, then, the assessment appears to be very similar to what the Court of Federal Claims thought it was not: a general

tax that falls proportionally on all utilities that benefitted from the DOE's uranium enrichment services.

*Id.* at 1576. The purpose behind both the primary provision of the Act, which divided the remediation costs between the federal government and the utilities, and the "secondary market" provision "was to spread the costs of a problem that [the government] realized only after the contracts had been performed." *Id.* at 1576–77 (quoting *Atlas Corp. v. United States*, 895 F.2d 745, 748 (Fed.Cir.1990)(noting that dangers and cleanup costs associated with milling operations were not fully recognized until the late 1970's.)).

It is significant that the court opined that to "the extent that the Energy Policy Act is designed to spread the costs of a societal problem" it is not unlike other legislation designed to spread societal costs such as "the costs of cleaning up hazardous waste under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.* (1994)." *Id.* at 1576 n. 6 (quoting *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 734 (8th Cir.1986)("Congress acted in a rational manner in imposing liability for the costs of cleaning up such sites upon those parties who created and profited from the sites and upon the chemical industry as a whole.")). Various cases construing CERCLA were cited by the court in *Yankee Atomic Electric Co.* "not for their insight as to Congress' motives in enacting the Energy Policy Act, but rather for their general proposition that the costs of large, unrecognized societal problems are frequently spread among those who benefited from the source of the problem." *Id.* at 1576. Consequently, the purpose in promulgating EPACT was, in effect, to cure a "free

---

4. The United States Supreme Court defined the doctrine as follows: "...the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925). The Court further explained:

> The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States

while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.

*Id.* (quoting *Jones v. United States*, 1 Ct.Cl. 383, 384 (1865)).

rider" problem,[5] that is, those that benefitted from the enrichment services—both commercially and by not having to pay the price of radioactive contamination resulting from the enrichment of uranium—ought to pay their fair share for remediation of the federal processing facilities.

From 1977 to 1983, plaintiffs entered into the standard fixed price contracts with the government for the acquisition of uranium enrichment services. Under the terms of the contracts, plaintiffs delivered feed material to the government and received in return enriched uranium to be used by plaintiffs for the generation of electricity. As explained above, under the contracts, the amount of money paid for enrichment was based upon the number of SWUs provided by the government under the contracts.

In 1984, prior to the enactment of EPACT, plaintiffs decided not to pursue their plans to operate nuclear generating plants. As a result, they resold all of the enriched uranium they had acquired from the government to other utilities. Plaintiffs' sales of government enriched uranium generally adopted the same assumed tails assay of .2%, which represented the equivalent number of SWUs reflected in their original purchases of the services from the government. However, in several cases market conditions dictated use of a higher tails assay of .3%, which plaintiffs' attorney explained at oral argument became the standard in the industry because it was learned that a lesser grade of enriched uranium was needed to run commercial reactors. Tr. of Oral Arg. at 38:11–16; Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss at 8.[6]

By deeming the tail assay of the enriched uranium product sold to the new buyer to be .3%, instead of .2% as in the original service contract, the uranium sold in this secondary transaction was considered to be less pure than what plaintiffs had initially purchased and was consequently re-sold at a lower market price. Since the tail assay percentage is the direct result of the number of SWUs needed to produce the enriched uranium, another consequence of reselling the enriched uranium as a lesser purity was that in calculating the special assessment under EPACT, the DOE imposed, as of the date of the second amended complaint, a tax in the amount of $336,987.74 against PSI, and over $67,000 against Cincinnati Gas, which was based on the original contract price of the amount of SWUs not sold to plaintiffs' buyers. PSI Energy, Inc. Second Am. Compl. ¶ 71; Cincinnati Gas & Electric Second Am. Compl. ¶ 71. The DOE justified this tax assessment on the grounds that, because plaintiffs sold their enriched uranium at a tails assay of .3% instead of the .2% provided under contract, not all of the SWUs as calculated under the original contracts were sold to plaintiffs' buyers. Supplemental Mem. of the United States at 6. In other words, even though plaintiffs sold their entire stock of enriched uranium, they had not re-sold all of the SWUs represented by that quantity of enriched uranium. The DOE imposed a special assessment on plaintiffs representing that part of the SWUs purchased under the original contract, but not later sold.

Plaintiffs, which are subsidiaries of a common-parent corporation filed their initial complaints on June 25, 1996, and July 10, 1995, respectively. On September 4, 1996, there was a court order staying the proceedings in the case until 45 days after a final judgment in *Yankee Atomic Electric Co.*, 112 F.3d 1569. *See* Stipulated Order Staying

---

5. The "free rider" problem may be defined as where a person receives the benefits of a "public good" or a "positive externality" yet does not contribute to paying the costs of producing those benefits. *See* 1 JAMES M. BUCHANAN, *Rights, Efficiency, and Exchange, The Irrelevance of Transactions Cost, in* THE LOGICAL FOUNDATIONS OF CONSTITUTIONAL LIBERTY 260, 269 (1999).

6. It is worthwhile to remind the reader that the lower the percentage of U–235 in the tail assay, which is the "remainder" or spent uranium, the higher is the percentage of U–235 in the enriched uranium "product." Defining purity and price by the produced waste product seems an odd way to calculate the purity and price of the product itself, but, then again, it often seems that a theoretical physicist is a person—much like an economist—"who sees something working in practice and wonders if it will work in theory." (Paraphrasing George Will, in "Jerry Brown's Urban Practicalities," *Washington Post,* June 16, 2002, quoting President Ronald Reagan, "who once said that an economist is someone who sees something working in practice and wonders if it will work in theory").

Proceedings, Judge Merow, Sept. 4, 1996. Thereafter, they requested their cases be consolidated for efficiency. This request was granted on December 10, 1998.

On February 1, 1999, plaintiffs filed their second amended complaints asserting taking and illegal exaction claims based on the EPACT assessment. They contend that they are entitled to a refund of the special assessment because it: (1) constituted an unlawful taking of plaintiffs' vested property rights protected by the Takings Clause of the Fifth Amendment to the United States Constitution; (2) violated the terms of the underlying statute; (3) violated the Due Process Clause of the Fifth Amendment to the United States Constitution because its imposition was excessively retroactive, harsh and oppressive; and (4) violated plaintiffs' right under "fixed-term" contractual agreements that were fully vested. Defendant thereafter on March 22, 1999, filed a motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(6).

On September 30, 1999, further proceedings were again stayed until the Federal Circuit issued its opinion in *Maine Yankee*, 271 F.3d 1357. *See* Order Staying Proceedings, Judge Merow, Oct. 4, 1999. After the Federal Circuit decision in that case, the parties were requested to provide supplemental memoranda regarding the effect of the relevant Federal Circuit decisions on the case at bar.

In their supplemental briefs, plaintiffs acknowledged that the Federal Circuit's decision in *Commonwealth Edison Co.* is controlling with respect to Count I ("Takings") and Count (III) ("Breach of Contract") of their amended complaint. Pls.' Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss at

4–5. Plaintiffs, nevertheless, allege that Count II ("Illegal Exaction") must still be addressed on the merits because: (1) DOE's imposition of the special assessments is based upon an "interpretation" of EPACT that is irrational and that violates the intent of the statute, and (2) the imposition of special assessments constitute an illegal exaction in violation of the Due Process Clause of the Fifth Amendment. *Id.* at 5. These are the remaining issues that this court must resolve.

On December 18, 2003, the court heard oral argument regarding defendant's motion to dismiss. During oral argument, the parties agreed that defendant's RCFC 12(b)(6) motion for failure to state a claim ought to be converted to one for summary judgment under RCFC 56.[7] The reason was, in part, plaintiffs' inadvertent failure to attach the contracts underlying the dispute to their second amended complaints, and the failure by both parties to supply relevant background materials explaining the origin and import of the term "SWUs."[8] Both are necessary, the court explained, to interpret the applicable portions of EPACT because the act refers to, but does not define, the term. Tr. of Oral Arg. at 25: 4–14. The parties agreed to supplement the record and jointly provide these materials. *See* Scheduling Order, Judge Block, Dec. 19, 2003. Indeed, the facts of this case are uncontroverted and only pure questions of law face the court. *See Yankee Atomic Electric Co.*, 112 F.3d at 1572–74 (opining that summary judgment is appropriate when salient facts of the case are not in dispute, and resolution of the dispute only requires the proper application of law).

## II. Discussion

### A. *The parties' arguments.*

Plaintiffs present two arguments in support of their claim that the assessment is

7. When material outside the complaint is presented to and not excluded by the court, "the motion shall be treated as one for summary judgment and disposed of as provided in [RCFC] 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion...." RCFC 12(b).

8. Generally, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002)(construing Rules 12(b) and 56 of the

Federal Rules of Civil Procedure, which the Court of Federal Claims adopted a mirror image of in 2002). *See* RCFC 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Because of the failure to attach the contracts and other documents explaining the origin and significance of the term "SWUs" to the amended complaint, the court and the parties thought it best to both review these materials and to consider the motion as one under Rule 56. Tr. of Oral Arg. at 55: 16–25.

unlawful. First, plaintiffs maintain that holding them responsible for any quantity of SWUs after the secondary market transactions is irrational and contrary to the intent of EPACT. Second Am. Compl. ¶ 89.

According to plaintiffs' interpretation of the "secondary market" provision of EPACT, because they abandoned their plans to proceed with the operation of nuclear power plants and subsequently resold *all* the enriched uranium in their possession they are not liable for the assessment. Plaintiffs explain that their secondary market transactions merely entailed "paper changes" in the amount of SWUs used to enrich the uranium being sold. In reality, they claim, by selling all the enriched uranium in their possession, they necessarily resold all the SWUs that went along with the enriched uranium. The core, then, of their argument is that the idea of SWUs do not exist in nature, it is a hypothetical construct that cannot be divorced from the enriched uranium itself.[9] Pls.' Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss at 6; Second Am. Compl. ¶ 26. Seemingly as proof of this, plaintiffs contend that they did not receive the enriched uranium they contracted for from the feed material they provide to the processing facilities. Tr. of Oral Arg. at 30–31: 22–13.

Plaintiffs' second argument (one that also goes to their statutory construction argument) is that because they were not the party that benefitted from the government's uranium services, imposing the retroactive assessments on them would violate due process under the test set forth by the Federal Circuit in *Commonwealth Edison* and *Yankee Atomic Electric Co.* Pls.' Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss at 6. ("[T]he Act impose[d] the assessment upon whichever utility company eventually use[d] the enrichment services." *Commonwealth Edison*, 271 F.3d at 1333 (quoting *Yankee Atomic Electric Co.*, 112 F.3d at 1572)). In other words, plaintiffs did not use the enriched material for the commercial generation of electricity, and, therefore, did not benefit from the production of the enriched uranium. Hence, plaintiffs contend they are not liable for the assessment since they resold the enriched uranium to another party which was the ultimate beneficiary of the enriched uranium.

Defendant responds by contending that, contrary to plaintiffs' view, *Commonwealth Edison* and *Yankee Atomic Electric Co.* stand for the proposition that EPACT imposes the D & D assessment on the ultimate user of the processing service as calculated in SWUs, not whoever winds up the ultimate owner of the enriched uranium itself. Supplemental Mem. of the United States at 5. Defendant asserts that it was plaintiffs' own business decision to adjust downward the number of SWUs in their secondary market transactions. *Id.* at 6. Consequently, defendant argues plaintiffs are liable for the portion of the assessment that relates to the number of SWUs they maintained after the secondary market transactions.

Furthermore, the DOE's calculation of the assessment based on its underlying regulation implementing EPACT, according to defendant, is entitled to deference under the *Chevron* doctrine. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Finally, defendant denies plaintiffs' due process claim by pointing out the Federal Circuit has already addressed and denied this contention primarily in *Commonwealth Edison*.

## B. *The rules for statutory interpretation.*

The core legal issue before the court is whether the tax assessment conforms to the dictates of EPACT. The ancillary issue is whether if properly imposed the tax levied against plaintiffs constituted an unlawful exaction contrary to the Due Process Clause of the Fifth Amendment. Consequently, the initial analysis requires interpretation of the applicable provisions of EPACT discussed above. In a rudimentary sense, this case, therefore, is about meaning, of how a statute is interpreted and then applied. If the road to hell is paved with good intentions, so is the

---

9. Plaintiffs' counsel made their position clear at oral argument: "our position is, by re-selling all of our enriched uranium, we necessarily re-sold all of the SWUs associated with that." Tr. of Oral Arg. at 39: 22–24.

road to ascertain meaning. To be sure, the search for meaning often produces more confusion than clarity, in part because courts traditionally have used short hand in explaining their approach.

For example, it is often stated that for the interpretation of statutes, it is the "intent of the legislature" that must be ascertained.[10] The underlying assumption is that separation of powers mandates that courts ascertain and carry out the will of the legislative branch. But, the hunt for legislative intent outside the actual words of a statute is much like Lewis Carroll's hunt for the snark,[11] at best a quixotic endeavor. This is so because corporate intent—the subjective intent of a collective body—here Congress—is a statistical impracticality.[12] And the unfortunate and today almost omnipresent use of legislative history such as committee reports and floor debates solely to discover this subjective and

enigmatic congressional intent led Justice Frankfurter as far back as 1947 to warn that the "[s]purious use of legislative history must not swallow the legislation so as to give point to the quip that only when legislative history is doubtful do you go to the statute." [13]

Statutes, unlike the common law, are in essence three-way communications between the legislature, the executive, and the public. (The President's potent say in the law-making process arises from the Constitution's requirement that all bills be presented to the President and made subject to a qualified veto. U.S. Const., art. 1, § 7.) Whose view of the statute then should be controlling? Consequently, the term "legislative intent" should not be equated with a subjective congressional intent, but instead a short hand for the actual meaning of enacted statutes. This is what Chief Justice Marshall meant when he observed that in construing statutes,

10. *See, e.g., D.C. Nat'l Bank v. D.C.*, 348 F.2d 808, 810 (D.C.Cir.1965)("[S]ince the judicial function is to ascertain the legislative intention the Court may properly exercise that function with recourse to the legislative history, and may depart from the literal meaning of the words when at variance with the intention of the legislature as revealed by legislative history."). This approach was later criticized by a panel of the D.C. Circuit as "undemocratic" and contrary to constitutional theory. *See United States v. McGoff*, 831 F.2d 1071, 1080 n. 19 (D.C.Cir. 1987).

11. *See* LEWIS CARROLL, "THE HUNTING OF THE SNARK: AN AGONY IN EIGHT FITS," a nonsense poem first published in 1876, which describes the sea voyage of a bellman, bootblack, bonnet maker, barrister, broker, billiard maker, banker, beaver, baker, and butcher, in their search for the elusive, mysterious snark. The danger from searching for a subjective congressional intent divorced from the statutory language itself is shown by this absurd conversation between Alice and Humpty Dumpty over the meaning of the word "glory" in another of Lewis Carroll's work, THROUGH THE LOOKING GLASS:

"There's glory for you!"
"I don't know what you mean by 'glory,'" Alice said.
Humpty Dumpty smiled contemptuously. "Of course you don't—till I tell you. I mean 'there's a nice knock-down argument for you!'"
"But 'glory' does not mean a 'nice knock-down argument,'" Alice objected.
"When *I* use the word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you *can* make words mean so many things."
"The question is," said Humpty Dumpty, "which is to be master—that's all."
LEWIS CARROLL, THROUGH THE LOOKING GLASS, 93–94 (Random House ed.1946).

12. *See, e.g.;* Max Radin, *Statutory Interpretation,* 43 HARV. L. REV. 863, 869 (1930)("...the intention of a legislature is undiscoverable in any real sense.... The chances that several hundred men each will have exactly the same ... situation ... [is] infinitesimally small."). Of course, legislators often vote for measures for differing motives, including "strategic voting," which often leads to cyclical and inconsistent outcomes. *See generally* P. MUELLER, PUBLIC CHOICE, 219–58 (1985); KENNETH ARROW, SOCIAL CHOICE AND INDIVIDUAL VALUES (2d ed.1963). And it is not unknown for staffers to slip language intended to aid certain constituencies into committee reports. It is also not unknown that the inserted language in committee reports either contradicts or (more common) is extraneous to statutory language. The intended result is often a statutory Humpty Dumpty scenario benefitting particular interests or causes, whereby the words or phrases of a statute can possibly be construed in the context of the inserted committee report language in a manner contrary to plain meaning. The result may also be seen as fostering a constructive ambiguity that may speed passage of the bill. Nevertheless, what is constructive for the legislative process maybe destructive of the clarity needed for the sake of statutory enforcement.

13. Felix Frankfurter, *Some Reflections on the Readings of Statutes,* 47 COLUM. L. REV. 527, 543 (1947).

"it has been truly stated to be the duty of the court to effect the intention of the legislature; but this intention is to be searched for in the words the legislature has employed to convey it." *Schooner Paulina's Cargo v. United States*, 11 U.S. (7 Cranch) 52, 60, 3 L.Ed. 266 (1812). Consequently, the job of a court, as Justice Holmes noted, is "not [to] inquire what the legislature meant; we ask only what the statute means." [14]

This search for meaning as the best way to ascertain the legislative will, has became known as the "plain meaning doctrine." [15] "Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings needs no discussion." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Thus, only where there is an ambiguity, where words are reasonably susceptible to

two or at least a finite few meanings,[16] may courts resort to these aids or rules. *E.g., Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n. 2. (Fed.Cir.2000). These "rules" are "extrinsic" and "intrinsic" aids, such as legislative history and the canons of statutory construction developed at common law. *See generally N. Singer*, 2A *Sutherland's Statutory Construction* Chpt. 47–48 (West 6th ed.2000).[17] But the plain meaning doctrine is not so plain. And the words "extrinsic" and "intrinsic" have developed a judicial gloss sometimes defying common sense, and sometimes contradictorily applied.

In reality, words have no "intrinsic" meaning. They are symbols which can only be understood by reference to external reality.[18] The word "cat" is intelligible if all know and agree to what is a cat. This is not to succumb to a philosophy of deconstruction,[19] to

---

**14.** Holmes, *The Theory of Statutory Interpretation*, 12 Harv. L. Rev. 417, 418–9 (1899).

**15.** The pedigree of this rule extends to the English Common Law and Sir William Blackstone:
The fairest and most rational method to interpret the will of the legislature, is by exploring his intentions at the time the law was made, by signs the most natural and probable. And these signs are either the words, the context, the subject matter, the effects and consequences, or the spirit and reason of the law. 1 William, Blackstone, Commentaries *59.

**16.** If there exists too many permutations of meaning, than the word or phrase suffers from a fatal indeterminancy. In such a case the better view is to not enforce the provision at all because the court would in essence legislate an outcome.

**17.** "Extrinsic" in law refers to matters not directly or textually related to the interpretation of a word or statutory clause or phrase or its construction, that is the application of the pertinent statutory language to the facts of a case. Legislative history is of course the most common. Another example is related legislation. "Intrinsic" refers to aids which give direct gloss to a statutory word or phrase, as well as aid in the application of the word or phrase to the facts of a case. This includes the use of a dictionary. The many rules of statutory construction designed to construe matters in some sort of context are another. These include the associated word doctrine (*noscitur a sociis*) and the similar classification by enumeration or qualification rule (*ejusdem generis*). *Id.* at §§ 47:01–38. These rules are not part of the law and are better seen as prophylactic tools in determining the context of words and phrases. *See Russell Motor Car Co. v. United States*, 261 U.S. 514, 519, 58 Ct.Cl. 708,

43 S.Ct. 428, 67 L.Ed. 778 (1923)(citing *Hamilton v. Rathbone*, 175 U.S. 414, 421, 20 S.Ct. 155, 44 L.Ed. 219 (1899)); *United States v. Barnes*, 222 U.S. 513, 518–519, 32 S.Ct. 117, 56 L.Ed. 291(1912)(rule of statutory construction should not be applied mechanistically where there is no ambiguity).

**18.** As explained by Justice Frankfurter:
Unlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision. If individual words are inexact symbols, with shifting variables, their configuration can hardly achieve invariant meaning or assured definiteness. Apart from the ambiguity inherent in its symbols, a statute suffers from dubieties. It is not an equation or a formula representing a clearly marked process, nor is it an expression of an individual thought to which is imparted the definiteness a single authorship can give. A statute is an instrument of government partaking of its practical purposes but also of its infirmities and limitations, of its awkward and groping efforts.
Frankfurter, *Some Reflections on the Readings of Statutes*, 47 Colum. L. Rev 537, 529 (1947)(quoted in N. Singer, 2A Sutherland's Statutory Construction § 45.01 (West 6th ed.2000)).

**19.** Deconstruction is a "postmodern" school of philosophy derived from the writings of Jacques Derrida and Paul De Mann which in essence rejects the idea of an independent reality beyond any text. As such it recognizes no superiority in an empirical explanation of the creation of the galaxies over a traditional belief in the mythic creation by gods and spirits, both being seen as a "truth." *See generally* A Dictionary of Critical Theory (London: Blackwell 1966).

resign to the increasingly fashionable view that actual (objective) meaning is an impossibility because all knowledge is the product of a subjective view born of the idiosyncratic and cultural experience of the beholder. It is, however, a bow to the wisdom of jurisprudential tradition, which long ago also established the rule that it is only through custom, usage, convention, and especially in its context, that language establishes a common and shared meaning.[20] *See Pennington v. Coxe,* 6 U.S. (2 Cranch) 33, 52–53, 2 L.Ed. 199 (1804)(Marshall, C.J.)("That a law is the best expositor of itself, that every part of an act is to be taken into view, for discovering the mind of the legislature; and the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act...."). *See also Transcontinental & Western Air v. Civil Aeronautics Bd.,* 336 U.S. 601, 605–06, 69 S.Ct. 756, 93 L.Ed. 911 (1949); *Western Union Telegraph Co. v. Lenroot,* 323 U.S. 490, 502–03, 65 S.Ct. 335, 89 L.Ed. 414 (1945); *Addison v. Holly Hill Fruit Products,* 322 U.S. 607, 616–18, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944).

As such, the better view is that to avoid a wooden literalism, a statute and especially its component parts should be read in context. *See Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. ——, 124 S.Ct. 1236, 1238, 157 L.Ed.2d 1094 (2004)("[s]tatutory language must be read in context [since] a phrase gathers meaning from the words around it") (quoting *Jones v. United States,* 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)(quotation omitted))(alterations in original). "Where the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived...." *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 385–89, 2 L.Ed. 304 (1805)(Marshall, C.J.) (analyzing statutory language in the context of the title of the statute). *See generally* R. Dickerson, *The Interpretation and Application of Statutes* 1158 (1975)("One is liberated from literalism by learning to read in context."). No hard and fast rule exists, in fact can be created, to determine when and under what circumstances context is im-

portant. This is why judicial decision-making is an art, not mathematics, and judges ought not fear being replaced by computers. For instance, it is well settled in our jurisprudence that a court need give effect to all parts of a statute when interpreting its essential terms and provisions. *Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569, 1576 (Fed.Cir.1997). And giving life to the spirit of *ejusdem generis,* courts should not interpret select provisions of a statute in isolation from others. *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492 (1962)("We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act...").

Similarly, at times the purpose or a design of a statute is paramount in understanding the context of its words and provisions: ergo, in initially interpreting the meaning of words, and, therefore, whether words and phrases are ambiguous. Of course, the " 'plain purpose' of legislation... is determined with reference to the plain language of the statute itself," not to a purpose section, which is mere precatory language. *Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 373, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). But the purpose of a statute and its underlying policy divined from the statutory text may be highly relevant to both the interpretation of words and the application of the statute to the facts at hand. *See, e.g., Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990)("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."). *See Gen. Dynamics Land Sys., Inc.,* 540 U.S. at ——, 124 S.Ct. at 1239–50 (construing Age Discrimination in Employment Act (ADEA) in light of congressional purpose in preventing "old age" discrimination in employment); *Yankee Atomic Electric Co.,* 112 F.3d at 1572(construing EPACT in light of purpose of statute and end to be achieved). *See also PCL Construction Services v. United States,* 41 Fed.Cl. 242, 253 (1998)(statute may be

---

**20.** This is also the view of Wittgenstein who recognized that the "meaning of a word is its use in the language." L. WITTGENSTEIN, PHILOSOPHICAL INVESTIGATIONS, 20e (G. Anscombe trans.1953).

construed consistent with underlying reason for its enactment especially where contrary interpretations of the legislative purpose are proffered).

Thus, if the Supreme Court's expression that there is no need for "interpretation" when "meaning is clear on its face" is taken as a talisman, statutory meaning would become a kind of judicial solipsism. Very often the "facial" meaning of words are not obvious. And this is not simply the result of a poor vocabulary. If the meaning of words are often dependent on some sort of context, it stands to reason that its ambiguity can only be ascertained after first construing the words within the statutory context. *See generally N. Singer*, 2A *Sutherland's Statutory Construction* § 47.02 (entitled "The Pertinent Context")(West 6th ed.2000). "Interpretation" of words is inevitable.

The lack of inherent meaning in words is also why such interpretive tools as dictionaries frequently have been used by courts to *initially* determine whether a statutory phrase or provision is ambiguous. This is logical because the working presumption is that Congress intends words have ordinary meaning, that undefined terms in a statute are deemed to have their ordinarily understood meaning. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir. 2002); *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed.Cir.1993). Consequently, use of dictionaries as interpretive aids are even employed in opinions labeled as literal statutory applications requiring no "interpretation" under the plain meaning doctrine. *See United States v. Alvarez–Sanchez*, 511 U.S. 350, 357–58, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). *See also Smith v. United States*, 508 U.S. 223, 228–229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed.Cir.2000)("A dictionary is not prohibited extrinsic evidence, and is an available resource of claim construction."); *International Business Machines Corp., v. United States*, 201 F.3d 1367, 1372 (Fed.Cir.2000)(quoting *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed.Cir.1993))("It is a basic principle of statutory interpretation ... that un-defined terms in a statute are deemed to have their ordinarily understood meaning. For that meaning, we look to the dictionary."(citations omitted)). And the Federal Circuit has even recognized that "dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining" the meaning of highly technical or scientific terms. *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir.2002); *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356–57 (Fed.Cir.2001)(quoting *C.J. Tower & Sons v. United States*, 69 C.C.P.A. 128, 673 F.2d 1268, 1271 (CCPA 1982)).

To be sure, even after the exercise of placing things in proper context and consulting dictionaries and technical journals, words and phrases may have a specialized meaning contrary to accepted ordinary usage. Generally, the burden is on the proponent of specialized meaning to rebut the ordinary meaning of words and phrases. *See Texas Digital Systems, Inc.*, 308 F.3d at 1203–04; *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.Cir. 1998). But, the context of a statutory provision also may demonstrate that words have acquired idiosyncratic or highly technical meaning through custom, commercial, trade, or legal usage. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n. 5, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)(quoting *Walters v. Metropolitan Ed. Enterprises, Inc.*, 519 U.S. 202, 207, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997)). *See Corning Glass Works v. Brennan*, 417 U.S. 188, 202, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)(term "working conditions" interpreted to have technical meaning in industrial usage). In such cases, external sources such as the gamut of legislative history, may be employed in the search for meaning. Here, the "extrinsic," by definition, must be employed to ascertain definition and meaning. Indeed, in this circumstance words or phrases may have no meaning at all without consulting extrinsic sources.

Once meaning is ascertained, the court must apply the applicable provision to the facts at hand. In other words, the issue shifts from the actual meaning of words or

phrases in a statute to the legal consequences of that meaning, *i.e.*, whether the facts of the case are "covered" by the statute. Under our constitutional system of separation of powers, both the search for statutory meaning and the determination of the statute's application to the facts of a case are quintessentially judicial power. While "[i]t is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society," wrote Chief Justice Marshall, "would seem to be the duty of other departments." *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162 (1810). *See Bowsher v. Synar,* 478 U.S. 714, 734, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)("[O]nce Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly by passing new legislation." citing *INS v. Chadha,* 462 U.S. 919, 958, 103 S.Ct. 2764, 2787–2789, 77 L.Ed.2d 317 (1983)). At least in ascertaining statutory meaning and its scope, that "other department" is the judiciary:

> It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Thus, how Congress would have resolved the particular issue facing the court is in a way irrelevant. Divining hypothetical congressional intent ignores the salutary fact that the language of a statute may purposefully be either over- or under-inclusive or that the resolution of the very issue at bar may never have been contemplated by the legislature simply because it is impossible to envision all eventualities. *See Diamond v. Chakrabarty,* 447 U.S. 303, 315–16, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980)(Burger, C.J.)(in construing whether 35 U.S.C. § 101 (1982), which contained language retained from the original 1793 Patent Act, encompassed the protection of laboratory created bacteria, obviously something never contemplated by the authors of the Act, the Court noted that it "frequently has ob-served that a statute is not confined to the 'particular application...contemplated by the legislators' .... Congress employed broad language in drafting § 101 precisely because ... inventions are often unforeseeable." (Citations omitted)). It is, simply put, only the statutory meaning and the consequence of that meaning that is germane.

Finally, the "plain" in the plain meaning rule does not require an absolute certainty free from any range of possibilities, only the "best reasonable" interpretation. The test is expressed in terms of "reasonable plain terms." "Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993)(quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). The judicial interpretive goal therefore is the most plausible meaning, not the only possible meaning. An inability to disregard the implausible would mean that ambiguities would almost always be present in any statutory text—especially since semantics is a tool of trade of any decent advocate.

### C. *The interpretation and application of EPACT.*

█ It is beyond any doubt that this case presents many, if not most, of the difficulties just described in ascertaining statutory meaning. Because EPACT does not define the crucial term "Separative Work Units," and such definitions are not provided in any dictionary or technical manual known to the court (or indeed to the parties), it is necessary to consult extrinsic sources. Fortunately, as already referenced in the "Background" section of this opinion, that term is adequately defined in the regulations promulgated by the DOE and its predecessors (such as the AEC) and its use in the underlying contract also aids in ascertaining its meaning. The term SWUs is not inscrutable after all.

Furthermore, applying the term within both the context of the critical "secondary market" provision and the design of EPACT

itself reveals both the object and the policy behind that act. *See Gen. Dynamics Land Sys., Inc.*, 540 U.S. at ——, 124 S.Ct. at 1240–48 (construing the term "age" in the ADEA to mean "old age" in light of congressional purpose and provision of act limiting its scope to those 40 years of age and older); *Crandon,* 494 U.S. at 158, 110 S.Ct. 997 (observing that the meaning of the statute is ascertained by its statutory language and the design and purpose of the statute). This policy makes crystal clear that the assessment imposed on plaintiffs by the DOE was a reasonable construction of EPACT. In fact, the DOE's interpretation was the most plausible one of the possible readings of the act, with the other possibly leading to absurd results.

The term SWUs has a lineage dating to 1964. The AEC was authorized in 1964 by the Private Ownership of Special Nuclear Materials Act of 1964, Pub.L. 88–489, 78 Stat. 602, 606 (codified in part at 42 U.S.C. § 2201(v)) (amending the Atomic Energy Act of 1954), to provide enrichment services in AEC operated processing facilities to utilities. Criteria setting forth the terms and conditions under which the AEC offered to provide uranium enrichment contracts was established by Notice of Rulemaking. *See* Atomic Energy Commission Uranium Enrichment Services, 31 Fed.Reg. 16479 (Dec. 23, 1966). It was in this Notice that the term "SWUs" first appeared. SWUs were defined as the "work devoted to separating a quantity of uranium (feed material) into two fractions, one a Product fraction containing a higher concentration of U–235 than the Feed and the other a Tails fraction containing a lower concentration of U–235." Atomic Energy Commission Uranium Enrichment Services, 31 Fed.Reg. 16479, n. 1 (Dec. 23, 1966).

The definition of SWUs underwent a slight variation in later years. In 1974, administrative authority over the uranium enrichment service contracts were transferred to the Energy Research and Development Administration, and then, to the DOE in 1977. *See* Energy Reorganization Act of 1974, Pub.L. 93–438, 88 Stat. 1233, 1234 (establishing the Energy Research and Development Administration); Department of Energy Organiza-

tion Act of 1977, Pub.L. 95–91, 91 Stat. 565. Thereafter, in 1986, the DOE slightly revised the uranium enrichment services criteria. The term "enrichment services," later referenced in the contracts, meant "separative work units necessary to enrich or further enrich uranium in the isotope U–235." 10 C.F.R. § 762.2 (1992). And SWUs were defined as:

> the measure of the effort required to separate a quantity of uranium feed material into (1) an enriched fraction containing a higher concentration of U–235 than the feed material and (2) a tails fraction containing a lower concentration of U–235.

*Id.* This definition of SWUs is functionally identical to the prior AEC defined term.

The sum and substance of all of this is that the term "SWUs" is a proxy for the time and effort needed for the government facility to process uranium to a specific degree of enrichment. It is thus abundantly clear that the utilities, including plaintiffs, were contracting not for the enriched uranium, as plaintiffs at least implicitly argue, but for the service (as calculated in SWUs) of the processing of uranium into a form containing enough U–235 isotope suitable for use in nuclear reactors. Indeed, the underlying contracts remove any vestige of doubt.

The contracts incorporate by reference the term SWUs and further clarify that they are for "enrichment services:" "DOE shall furnish to the Customer during the term of this contract, and the Customer shall purchase from DOE the Customer's reasonable requirements for *enrichment services* in connection with the operation of the Customer's nuclear power facility . . ." Contract at 3 (emphasis added). And, as stated, the term "enrichment services," incorporated from the regulation, is defined in the contracts as "the separative work necessary to enrich or further enrich uranium in the isotope 235." *Id.* at 2. Indeed, the contracts each mention the terms "service," "enrichment services," and "separative work," about 100 times as the consideration to be provided by the DOE. *See generally* Contract. Furthermore, that the contracts were for enrichment services and not for the uranium to be used in the reactors is demonstrated by the stubborn

facts that, pursuant to the contracts, the utilities themselves had to initially provide the uranium feed material for processing and had the option to obtain the depleted uranium tails material that "result[ed] from the performance of the enrichment services." Contract at 13; *see also* 10 C.F.R. § 762.12 (1992)(permitting utilities to contract for the option to obtain depleted uranium tails). That the utilities were at times supplied with enriched uranium product resulting not from the specific feed material they supplied does not make the contract one for the enriched uranium itself, as plaintiffs seemingly argue. This is so because of the fungible nature of fuel and because the contracts make clear that this was done for the convenience of the DOE, both of which actually strengthen the argument that the utilities were purchasing a service and not uranium. Contract at 10–11.

That we are dealing with a contract for a service makes the pertinent provision of EPACT fairly easy to construe. Under EPACT the special assessment imposed on each utility was based on the percentages of SWUs purchased from the DOE in proportion to the number of SWUs produced by the DOE. 42 U.S.C. § 2297g–1(c). It is convenient once again to quote verbatim the "secondary market" provision:

> (1) a utility shall be considered to have purchased a separative work unit from the Department if such separative work unit was produced by the Department, but purchased by the utility from another source; and
>
> (2) a utility shall not be considered to have purchased a separative work unit from the Department if such separative work unit was purchased by the utility, but sold to another source.

*Id.* This language is unambiguous. It means that a utility which purchased the SWUs from DOE will be charged the special assessment except in situations where they resold the SWUs to a third party. In this situation, the third party, the ultimate user of the SWUs, must pay. Notice that what is being assessed is not the enriched uranium produced nor a service calculated as a "loadstar" figure (dollars per hour of service). Instead, the assessment is predicated upon "a separative work unit." Notice again that the term is in the singular. The use the singular means that Congress projected that transactions in the secondary market could conceivably result in partial sales of the service. In other words, the literal wording of the provision demonstrates that Congress foresaw three eventualities: (1) that some of the SWUs may be sold to a third party and some retained by the original purchaser of the service; (2) that all of the SWUs may be sold to a third party; or (3) that none of the SWUs would be sold, that is, that all of the SWUs would be retained by the original purchaser. Any other construction here would be irrational.

To be sure, the purpose of the this provision supports this construction. As noted in the Background section, the court in *Yankee Atomic Electric Co.* explained that this provision was "designed to take into account the secondary market that existed for uranium enrichment services, wherein some utilities purchased uranium work units from the government and resold them to other utilities." *Yankee Atomic Electric Co.,* 112 F.3d at 1572 n. 1. Thus, its purpose "was to spread the costs of [the remediation] problem that [Congress] realized only after the contracts had been performed." *Id.* at 1576–77 (citation and quotation omitted). In other words, by calculating the service in SWUs, and recognizing that utilities would either sell all of their SWUs or retain some of them, Congress took advantage of the existence of the secondary market in devising a scheme designed to maximize the distribution of the cost of remediation.

This leaves open whether the DOE's actual levy of the special assessment on plaintiffs is a plausible interpretation and application of the secondary market provision. There are two ways to apply the secondary market provision to plaintiffs' situation (*i.e.,* where the utility sold all its enriched uranium, but because the enriched uranium was arbitrarily deemed in its sales contract to be the product of a lower number of SWUs than in the original contract between the utility and the DOE, it was sold at a lower market price).

The first is to adopt plaintiffs' position and assume that the original contracts for the

enrichment service were really not for a fixed amount of SWUs but for the enriched uranium itself and assess the entire tax on the third party buyer as the "ultimate user of the service." There are severe difficulties arising from plaintiffs' equating of the enriched uranium produced, not to the number of SWUs from the original contract between the utility and the DOE, but to the amount of SWUs set by the secondary market contract and purchased by the buyer. The first is that it is obviously contrary to the plain meaning of the "secondary market" provision. The term "a separative work unit" contained therein pertains to a unit of time and work expended by the federal processing facilities needed to enrich uranium. It thus refers to the quantity of SWUs in the contracts between the utilities and the DOE needed to enrich the uranium to be used in reactors. This term, in fact, was established and fixed by the underlying regulations, mentioned in the Background section of this opinion, enabling the DOE and its predecessors such as the AEC to enter into uranium enrichment servicing contracts with utilities. The "secondary market" provision of EPACT merely permits the tax to be assessed on those in the secondary market not in privity with the DOE in order to spread the cost of the remediation. It does not alter the meaning of the term SWUs or allow those engaged in secondary market transactions to alter its meaning by changing the quantity and value of the SWUs.

To do so would produce absurd results because the amount of tax collected and deposited in the Treasury would be determined, not by Congress, but by the utility and its buyer in the secondary market transaction. In EPACT, Congress established the special assessment as a ratio of the product of the

number of SWUs bought by the utility that year over the total number produced by the federal processing facility that year. In the new scenario, although it could conceivably still be a factor of the total number of SWUs produced in the year of the of the original contract between the utility and the DOE, the calculation of the special assessment would increase or decrease depending on whether the number of SWUs sold in the secondary market contract—representing the very same quantity of the enriched uranium in the original contract between the utility and the DOE—increased or decreased. Furthermore, under this scenario, the almost $500 million goal set by EPACT for the D & D costs might not be reached.

The only real and plausible construction is the one chosen by the DOE: the assessment was a factor of the original contract price of the enrichment services provided to the plaintiffs, reduced by the extent to which plaintiffs passed these service costs on to customers when they sold them the enriched uranium. It is true to the plain meaning of the secondary market provision. And this interpretation also has the advantage of furthering the purpose of the secondary market provision by maximizing the spread of the cost of cleanup. It also assures a uniformity of the tax collection, one determined by the amounts authorized to be collected by EPACT, and not subject to idiosyncratic business needs of particular utilities.

DOE regulations explicitly state the reason underlying their construction of the "secondary market provision"—a market transaction should not be able to alter the amount of SWUs purchased from DOE, and, thus, the amount of the special assessment to be collected.[21] Uranium Enrichment Decontami-

21. If a utility purchased DOE-produced SWUs from another utility, the purchasing utility's assessment will be based on the SWUs specified in contracts or other probative documents generated at the time of the secondary market purchase. The selling utility's assessment will be reduced by an amount that will be determined by the SWUs sold to the purchasing utility. For instance, in the event that the SWUs purchased in the secondary market transactions were less than the SWUs originally purchased from DOE, the selling utility will be assessed for the difference.... In general, where a secondary market sale result-

ed in a net difference in SWUs, there will be no increase or decrease, for Special Assessment purposes, in the total number of SWUs purchased from DOE. The Department bases this principle on its interpretation of EPACT, which requires Special Assessments to be determined on the basis of the total SWUs purchased from DOE by domestic utilities for the purpose of commercial electricity generation. To implement this requirement, DOE believes that secondary market transactions cannot be allowed to effect a net increase or decrease, for Special Assessment pur-

nation and Decommissioning Fund; Procedures for Special Assessment of Domestic Utilities, 59 Fed.Reg. 41,956, 41,958–59 (Aug. 15, 1994). Thus, according to the DOE's view of EPACT, if in a secondary market transaction the reselling utility lowers the amount of SWUs that were originally purchased from the DOE, it will retain liability for the amount of SWUs that it did not resell.[22]

The court finds, contrary to plaintiffs' assertion, that this assessment is rational. Plaintiffs had, for business reasons, freely chosen to sell their enriched uranium for a price below the cost of the original enrichment service needed to produce the enriched uranium. Under the assessment, the buyers of the enriched uranium had to pay the proportionate share of the special assessment calculated as a proportion of the current price the buyers paid for the enriched uranium to the original contract price of the enrichment service needed to produce the enriched uranium. As stated above, if the plaintiffs would have sold the enriched uranium at a price reflecting the original cost of the enrichment service, they would have had to pay no special assessment. Because under the contracts the plaintiffs purchased a service as calculated in terms of SWUs, and not the enriched uranium itself, the DOE's calculation and imposition of the special assessment on plaintiffs can hardly be called irrational.

The court also rejects plaintiffs' other argument that the special assessments were improperly levied because the "secondary market" provision of EPACT "impose[d] the assessment upon whichever utility company eventually use[s] the enrichment services," *Commonwealth Edison Co.*, 271 F.3d at 1333 (quoting *Yankee Atomic Electric Co.*, 112 F.3d at 1572), and plaintiffs sold their *entire* stock of enriched uranium and, thus, never used the service for commercial purposes— that is, they never ultimately benefitted from the service.

As alluded to above, plaintiffs simply misconstrue the Federal Circuit's summary of the "secondary market" provision. The Federal Circuit is using the term "enrichment service" as a synonym for SWUs and the DOE's assessment imposed on plaintiffs is certainly a reasonable way of calculating the determination of the ultimate user of the SWUs here. Furthermore, whether or not plaintiffs commercially benefitted from the enrichment service is irrelevant.[23] They certainly could have used the service to generate and sell power, but instead made a conscious business decision not to produce nuclear power generated electricity and sell their enriched uranium (in terms of SWUs) on the secondary market. Of course, sales in a secondary market is in itself a "legitimate use" or benefit of the service. The law does not guarantee plaintiffs profits in any market.

poses, in the total number of SWUs that were purchased from DOE for all purposes.

Uranium Enrichment Decontamination and Decommissioning Fund; Procedures for Special Assessment of Domestic Utilities, 59 Fed.Reg. 41,-956, 41,958–59 (Aug. 15, 1994).

22. The DOE also provided a pertinent illustration of this principle:

Utility A purchases 100 SWUs from DOE. In a subsequent sale, Utility A changes the calculated SWUs and sells the 100 SWUs to utility B in a transaction for only 80 SWUs. Utility B's assessment is based upon 80 SWUs. Utility A's assessment is based upon the remaining 20 SWUs unaccounted for in the secondary market transaction.

*Id.* at 41,959.

23. A good analogy would be where the owner of a sports car brings his vehicle to the dealer to be "turbo-charged." While in the service department and unbeknownst to the dealer, the owner being in debt sells the automobile to a third party for below market price but for cold cash. When receiving the bill for the service, the former owner refuses to pay complaining that he will not "benefit" at all from the turbo-charging and the thrill of racing his car, of feeling the wind through his hair. No one can doubt that this is *chutzpah*. Of course, this hypothetical is not perfect because it does not take into account something analogous to the "secondary market" provision of EPACT. Nevertheless, it is worthwhile noting that if Congress did not include such a provision in the act, plaintiffs here would have been liable for the *entire* special assessment, whether or not they ever generated a joule of electricity from the enriched uranium. And the legality of the special assessment was, of course, upheld in both *Yankee Atomic Electric Co.* and *Commonwealth Edison.*

Furthermore, as pointed out, the court in *Yankee Atomic Electric Co.* makes clear that benefit derived from the ultimate user of the service refers in part to an "unpaid benefit." In other words, EPACT was, in effect, designed to cure a "free rider" problem by imposing a fair share of the costs of remediation of the federal processing facilities on those who benefitted from the enrichment services. Plaintiffs here were assessed a proportionate share of the costs of cleanup based on the SWUs not passed on in their secondary contract.

Finally, the court rejects defendant's argument made in its briefs that so-called *Chevron* deference is owed the DOE's regulation interpreting and implementing the special assessment provisions of EPACT. Supplemental Mem. of the United States at 8; Resp. of the United States to Pls.' Supplemental Mem. at 7. *See Chevron, U.S.A., Inc.,* 467 U.S. at 844, 104 S.Ct. 2778.[I]f "the statutory language is plain and unambiguous, then it controls, and we may not look to the agency regulation for further guidance." *Information Technology & Applications Corp. v. United States,* 316 F.3d 1312, 1320 (Fed.Cir. 2003). *See Chevron, U.S.A., Inc.,* 467 U.S. at 842–43, 104 S.Ct. 2778; *Gallegos v. Principi,* 283 F.3d 1309, 1312 (Fed.Cir.2002). Here, the court has found that the applicable language of EPACT is plain and free of ambiguity.[24] *See Gen. Dynamics,* 540 U.S. at ——, 124 S.Ct. at 1248 ("Even for an agency able to claim all the authority possible under *Chevron,* deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."). Hence, the *Chevron* doctrine does not apply.

## C. Does the DOE's assessment constitute an unconstitutional exaction?

■ Lastly, the court essentially agrees with defendant that *Commonwealth Edison,* which upheld the retroactive EPACT assessment in the face of a due process challenge, is dispositive of plaintiffs' unconstitutional exaction claim. Indeed, once the court has upheld the reasonableness of the DOE's interpretation and application of the "secondary market" provision, the plaintiffs have failed to demonstrate that assessment violated either prong of the two-part due process test established by *Commonwealth Edison.*

In *Commonwealth Edison,* the Federal Circuit rejected the contention that the retroactive assessment imposed by EPACT violates due process because it "rationally furthers a legitimate legislative objective—the remediation of contaminated facilities used by the United States to process uranium for domestic utilities." *Commonwealth Edison,* 271 F.3d at 1330. The court established a two part test to determine when the "imposition of even severe retroactive obligations for past acts will be found rational," and therefore, constitutional under the Due Process Clause. *Commonwealth Edison,* 271 F.3d at 1346. In order to be constitutional the retroactive obligation must satisfy either of two conditions:

(1) Congress reasonably concluded that the party subjected to retroactive obligations benefitted from activity that contributed to a societal problem, and liability is not disproportionately imposed on that party; and (2) the imposition of retroactive liability would not be contrary to that party's reasonable expectations.

*Id.*

The court found that the first condition was satisfied because Edison admitted that

---

**24.** Ironically, the DOE's own regulation make clear the *Chevron* doctrine does not apply. "DOE believes that the EPACT is *unambiguous* in regard to the statutory applicability of the Special Assessment to domestic utilities." 59 FR 41,956, 41,958 (1994)(emphasis added). Moreover, at oral argument defendant's counsel when queried by the court concerning the DOE's position in their implementing regulation seemingly abandoned their *Chevron* deference argument.

THE COURT: I have to make a determination on whether the statute is clear on its face. If it's not clear on its face and it's ambiguous, then I apply *Chevron* and I will then give the Department of Energy interpretation deference.

DEFENDANT'S COUNSEL: I believe the statute is clear on its face and it explicitly requires the outcome that we are advocating.

THE COURT: Okay, so I shouldn't do a *Chevron*—

DEFENDANT'S COUNSEL: I don't believe it's necessary to.

Tr. of Oral Arg. at 16: 12–21.

they received a benefit from the enrichment services provided by the government. Furthermore, the remediation costs were found not to be severely disproportionate since Edison and the other domestic utilities only have to contribute a third of the remediation costs even though there was evidence that "the production from these plants ha[d] been divided almost evenly between the government and commercial sectors." *Id.* at 1346–47 (quoting H.R.Rep. No. 102–474(I), at 144 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953, 1967).

As for the second condition, the Federal Circuit considered three factors in determining a party's reasonable expectation. "First was the company operating in a highly regulated industry? Second, did the company know of the problem at the time it engaged in the activity? Third, in the light of the regulatory environment at the time of the activities, could the possibility of the assessments have been reasonably anticipated?" *Id.* at 1348. The Federal Circuit concluded that all three of the factors were satisfied because: (1) "the production of energy from nuclear sources is one of the most highly regulated human activities." *Id.*(quoting *Legal Control of Nuclear Energy Between States*, 21 Cal. W. Int'l L.J. 303, 303 (1991)); (2) the utilities knew of the hazardous nature of the materials and that the enrichment facilities would eventually need to be decontaminated; and (3) *Commonwealth Edison* could have reasonably anticipated that the clean-up effort could result in retroactive legislation on utilities that benefitted from the processing facilities since other statutes such as CERCLA and a long tradition of governmental regulation of the environment were already in place. *See id.* at 1348–52.

In the case at bar, plaintiffs take issue with both the "benefit" and "foreseeable" requirements that were established in *Commonwealth Edison*. Plaintiffs argue that their decision to halt their plans to operate power plants and their subsequent sale of the enriched uranium processed by the government leaves them with no benefit. Pls.' Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss at 6. In addition, they claim that they sold the enriched uranium at a loss, and

therefore, could not have benefitted from the service. Furthermore, plaintiffs allege that according to *Commonwealth Edison* they could not have foreseen assessment liability since they were not the purchaser of enriched uranium. Tr. of Oral Arg. at 47: 13–19.

As explained at some length in the prior section, these contentions are not reasonable and misconstrue the plain meaning and purpose of the "secondary market" provision. Clearly, plaintiffs did benefit from the enrichment service. They had the right to use the enriched uranium for any lawful reason and simply chose to sell their enriched uranium as the result of a rational business decision to no longer generate electricity based on nuclear power. And they also benefitted from an unpaid benefit, the cost of remediation of the uranium processing facilities due to radioactive contamination.

Finally, plaintiffs' assertion that they could not have foreseen assessment liability is belied by *Commonwealth Edison:*

> Edison [utility company] could have reasonably expected that the enrichment of its uranium by an independent contractor (the United States) could result in the passage of legislation retroactively imposing liability for a portion of the remediation costs on Edison and the other utilities that benefitted from the processing facilities.

*Commonwealth Edison,* 271 F.3d at 1351–52. Hence, plaintiffs are factually similarly situated to the plaintiff purchasers of enrichment services in *Commonwealth Edison* and should have foreseen being assessed a clean-up cost for the contamination of the federal uranium processing facilities.

Plaintiffs here bear a heavy burden in establishing that economic legislation such as EPACT is irrational and must in fact "negative every conceivable basis which might support it." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)(quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). This burden has not been met.

### III. Conclusion

For the reasons set forth above, the court GRANTS defendant's motion for summary judgment and hereby ORDERS the Clerk of the Court to enter judgment in favor of the United States. No costs.